**Beryl N. JONES, et al., Plaintiffs,**

v.

**CADDO PARISH SCHOOL BOARD, et al., Defendants-Appellees,**

v.

**June PHILLIPS, Movant-Appellant.**

**No. 81–3439.**

United States Court of Appeals, Fifth Circuit.

July 9, 1984.

Rehearing Denied Aug. 9, 1984.

Troy E. Bain, Shreveport, La., for movant-appellant.

Beard, Arceneaux & Sutherland, Fred H. Sutherland, Shreveport, La., Brian F. Heffernan, Wm. B. Reynolds, Asst. Atty. Gen., Jessica D. Silver, Wm. R. Yeomans, Civil Rights Div., Appellate Sect., Dept. of Justice, Washington, D.C., for defendants-appellees.

Before CLARK, Chief Judge, BROWN, GOLDBERG, GEE, RUBIN, REAVLEY, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM, and DAVIS, Circuit Judges.[*]

GARWOOD, Circuit Judge:

This is an appeal by June Phillips from the denial of her motion to intervene, individually and on behalf of a class of black parents and children, in this long-pending litigation concerning the desegregation of the Caddo Parish school system. We sustain the district court's ruling, holding that it did not abuse its discretion in determining that Ms. Phillips' motion was untimely.

This litigation began in 1965 when seven black school children and their parents filed a complaint against the Caddo Parish School Board alleging the school system was operated on a biracial basis, in violation of their rights under the equal protection clause of the fourteenth amendment. Plaintiffs sought to represent themselves and a class of "Negro children and their parents in Caddo Parish," pursuant to

---

[*] Judge Goldberg, a senior judge of this circuit, is participating as a member of the panel initially deciding the appeal [704 F.2d 206] now subject to en banc review. 28 U.S.C. § 46(c).

Judge Politz recused.

Rule 23(a)(3), Fed.R.Civ.P., as then in effect.[1] Later the same year, the United States sought to intervene as a party plaintiff pursuant to Title IX of the 1964 Civil Rights Act, 42 U.S.C. § 2000h–2.[2] We held it was entitled to do so, *United States v. Jefferson County Board of Education,* 372 F.2d 836, 896 (5th Cir.1966), *aff'd with modifications,* 380 F.2d 385 (5th Cir.) (en banc), *cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967), and thereafter the United States has participated as a party to the case.

As set out in more detail below, in 1973 the district court approved and made "the order of this Court" a school desegregation plan developed after several public hearings by a biracial Citizens Committee which the court had appointed on the motion of the United States. The Committee's unanimous report stated that the plan's full implementation would convert "the school district to a unitary system." The United States approved implementation of the plan, but did not commit itself, one way or the other, as to whether the plan would achieve unitary status. The plaintiffs, however, not only requested implementation of the plan, but also specifically took the position that its complete implementation "will provide a unitary school system in Caddo Parish." Later the same year, several other black parents and students sought to intervene, individually and as representatives of a class or subclass of black students and parents, to attack the 1973 plan on the ground that it maintained too many "racially identifiable and one-race schools." They alleged that the plaintiffs did not adequately represent their interests and the United States did not either. In August 1974 we reversed the district court's denial of the requested intervention, holding that the applicants "are entitled to an evidentiary hearing on their motion to intervene." *Jones v. Caddo Parish School Board,* 499 F.2d 914, 917 (5th Cir. 1974) (per curiam). The attempted intervention, however, was never pursued thereafter. The school district continued to operate under the 1973 plan until 1981, and the case remained largely inactive. After August 1974 the plaintiffs took no action whatever in the case, except for filing a memorandum in January 1977 taking the position that the 1973 plan had not been entirely complied with and should be "continued in effect until fully implemented."

On June 3, 1980, following a status conference the previous day attended only by attorneys for the School Board and the United States, the district court entered a minute order providing that counsel should contact the court within thirty days if "plaintiffs still have a viable interest in this

---

1. Former Rule 23(a)(3) provided:

    "(a) Representation. If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is ... (3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought."

    Rule 23 as then in effect did not provide for class certification. However, Rule 23 was amended, effective July 1, 1966, to include the present requirement of Rule 23(c)(1) for class certification. The amended rule applied to actions pending on its effective date. *See Hohmann v. Packard Instrument Co.,* 399 F.2d 711, 713 (7th Cir.1968); *Alvarez v. Pan American Life Insurance Co.,* 375 F.2d 992, 993 (5th Cir.), *cert. denied,* 389 U.S. 827, 88 S.Ct. 74, 19 L.Ed.2d 82 (1967). *See also Atlantis Development Corp. v.*

    *United States,* 379 F.2d 818, 823 (5th Cir.1967). Nevertheless, no class has ever been certified, nor any class representative appointed, in this case; nor has any hearing on such matters been held (or requested by any party to the action). However, no complaint is made in any of these respects on the present appeal. · *See* note 16, *infra.*

2. 42 U.S.C. § 2000h–2 provides:

    "Whenever an action has been commenced in any court of the United States seeking relief from the denial of equal protection of the laws under the fourteenth amendment to the Constitution on account of race, color, religion, sex or national origin, the Attorney General for or in the name of the United States may intervene in such action upon timely application if the Attorney General certifies that the case is of general public importance. In such action the United States shall be entitled to the same relief as if it had instituted the action."

case." [3] Copies of this order were sent all counsel who had ever appeared in the case, including those representing the 1973 intervention applicants, and none ever made any affirmative response. Thereafter, the United States and the School Board entered into widely publicized negotiations, which lasted nearly a year, and culminated on May 5, 1981 when they executed a proposed two-party Consent Decree, which the district court entered on May 7, 1981. Pursuant to the court's directions, the decree was publicized and a ten-day period allowed for objections. Ms. Phillips, though she timely filed objections of a limited nature, now essentially abandoned, did not seek to intervene until May 22, 1981, four days after the expiration of the period for filing objections. The United States and the School Board opposed her intervention, among other grounds, as being untimely. Without holding an evidentiary hearing, the district court denied intervention on that basis. It also ruled that Ms. Phillips' interests were adequately represented by the United States.

The complaint which Ms. Phillips seeks to make by her intervention is that the Consent Decree will leave too many one-race or predominantly one-race schools attended by too high a proportion of the district's black students. This is essentially the same complaint made by the 1973 intervention applicants concerning the 1973 plan. Concededly, however, the Consent Decree provides a material improvement in those respects from the 1973 plan, which the United States had not previously opposed and which the plaintiffs regarded as providing a unitary system.

■ Under the unchallenged facts here, Ms. Phillips, and those she sought to represent, knew, or at the very least should have known, of their interests in the case some six years or more before they sought intervention. Indeed, these same interests were reflected in the 1973 attempted intervention, sought on the basis that neither the plaintiffs nor the United States adequately represented those interests. That intervention was not pursued after 1974, and the school system continued to operate under the 1973 plan, with the blessing of the plaintiffs and without challenge by the United States, until the 1981 Consent Decree. That decree, an unquestioned material improvement over the 1973 plan from the point of view of the 1973 and 1981 applicants for intervention, violates no express or implied assurances to the would-be intervenors and represents no change of position adverse to their interests. Nor are they parties to it or bound by it. It was arrived at after an arduous and well-publicized settlement process lasting nearly a year, of which Ms. Phillips and the interests she seeks to represent were indisputably aware. Under these circumstances, the district court did not abuse its discretion in determining that intervention sought after the time for filing objections to the decree was untimely. No hearing was necessary because the matters apparent of record support the district court's determination, there being neither challenge to them nor proffered facts to justify or explain the evident untimeliness which they reflect. Indeed, the lack of a hearing, as such, is not the focus of Ms. Phillips' appeal.

■ By the express terms of Rule 24, Fed.R.Civ.P., it is apparent that timeliness is a prerequisite for intervention additional to all the other necessary conditions for that relief (including, as to intervention of right, lack of adequate representation by any existing party). And, it has been uniformly held that the district court's determination of whether the requested intervention is timely may be reversed only for abuse of discretion. As the Supreme Court stated in *NAACP v. New York*, 413 U.S. 345, 93 S.Ct. 2591, 37 L.Ed.2d 648 (1973):

---

3. The order provided in relevant part:

"If the original plaintiffs still have a viable interest in this case, their counsel should contact the court, in writing, within thirty (30) days of this order. If the plaintiffs' counsel does not respond, this court will consider that the plaintiffs acquiesce in having their interests represented by the United States as plaintiff-intervenor."

"... the application must be 'timely.' If it is untimely, intervention must be denied. Thus, the court where the action is pending must *first* be *satisfied* as to *timeliness*. Although the point to which the suit has progressed is one factor in the determination of timeliness, it is not solely dispositive. Timeliness is to be determined from all the circumstances. And it is to be determined by the court in the exercise of its sound *discretion; unless that discretion is abused, the court's ruling will not be disturbed* on review." *Id.* at 365–66, 93 S.Ct. at 2603 (footnotes omitted; emphasis added).[4]

And, where facts justifying the conclusion that the application is untimely are undisputed and apparent on the face of the record, intervention may be denied on this ground without a hearing, as we expressly held in *United States v. Louisiana,* 669 F.2d 314, 315 (5th Cir.1982).

*NAACP v. New York, supra,* is particularly instructive. There, New York sued the United States in December 1971 for declaratory judgment that literacy tests in certain New York counties had not abridged the right to vote on account of race, and hence were not proscribed by the Voting Rights Act's prohibition of such tests in political subdivisions, such as the counties concerned, where less than half those of age voted in the 1968 presidential election. On March 10, 1972 the United States filed its answer stating it was without information sufficient to form a belief as to the truth of New York's allegations, and on March 17 New York moved for summary judgment, which the United States consented to on April 3. The NAACP and black voters and elected officials in one of the counties moved to inter-

vene on April 7. The United States did not oppose the intervention. On April 13 the district court granted the summary judgment and denied the intervention. Affidavits, which the Supreme Court accepted *arguendo* as accurate, showed that intervenors first learned of the suit on March 21 and of the United States' consent to the motion for summary judgment on April 5; that on March 23 a Justice Department attorney had advised the NAACP's counsel "that papers were being prepared in opposition to New York's motion for summary judgment"; and that during the last two weeks in March "attorneys in the Department of Justice thrice had represented to appellants' counsel that the United States would oppose New York's motion for summary judgment." *Id.* 413 U.S. at 361–62, 93 S.Ct. at 2600–01. Intervenors also alleged that the Justice Department inadequately investigated the case and that evidence was available, precluding summary judgment, that in the counties concerned education afforded nonwhite children by New York was substantially inferior to that afforded whites with resulting lower literacy rates for nonwhites otherwise eligible to vote. *Id.* at 362–64, 93 S.Ct. at 2601–02.

The Supreme Court held that "because of the motion's untimeliness" the district court's denial of intervention was "not an abuse of the court's discretion." *Id.* at 366, 93 S.Ct. at 2603. The Court initially observed that the district court could reasonably have concluded that the intervention applicants "should have known of the pendency" of the action as early as February because, among other things, of a *New York Times* newspaper article and "public

---

**4.** The abuse of discretion standard has been applied innumerable times by this Court in sustaining district court denial of intervention as untimely, *see, e.g., Lelsz v. Kavanagh,* 710 F.2d 1040, 1043 (5th Cir.1983); *United States v. Louisiana,* 669 F.2d 314, 315 (5th Cir.1982); *United States by Bell v. Allegheny-Ludlum Industries, Inc.,* 553 F.2d 451, 453 (5th Cir.1977) (per curiam), *cert. denied sub nom. United Steelworkers Justice Committee v. United States,* 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978), as well as in sustaining the district court's determination,

in allowing intervention, that it was timely sought. *Diaz v. Southern Drilling Corp.,* 427 F.2d 1118, 1125 (5th Cir.), *cert. denied sub nom. Trefina A.G. v. United States,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). The district court's discretion in denying intervention as untimely is likewise recognized by other circuits. *See, e.g., Michigan Association for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir.1981); *Garrity v. Gallen,* 697 F.2d 452, 455 (1st Cir. 1983); *United States v. Jefferson County,* 720 F.2d 1511, 1516 (11th Cir.1983).

comment by community leaders." *Id.* It went on to hold that, in any event, the answer of the United States "revealed that it was without information with which it could oppose the motion for summary judgment," and it was hence "incumbent upon the appellants ... to take immediate affirmative steps to protect their interests either by supplying the Department of Justice with any information they possessed ... or ... by way of an immediate motion to intervene," rather than relying "on representations said to have been made by Department of Justice attorneys during the course of telephone conversations." *Id.* at 367–68, 93 S.Ct. at 2604. Because of its conclusion that the motion was untimely, the Court expressly declined "to consider whether other conditions for intervention under Rule 24 were satisfied." *Id.* at 369, 93 S.Ct. at 2605.

Similarly instructive is this Court's decision in *United States v. Louisiana*, 669 F.2d 314 (5th Cir.1982), affirming the district court's denial without a hearing of requested intervention. That case involved an action commenced in March 1974 by the United States against the State of Louisiana and state higher education agencies seeking the dismantling of an allegedly unlawful dual system of higher education based on race. Subsequently, the district court denied without a hearing a motion to intervene by the NAACP and its state president, and in December 1976 this Court remanded with instructions that a hearing be held on the motion. *United States v. Louisiana*, 543 F.2d 1125 (5th Cir.1976). Thereafter, for several years little activity ensued in the case. Then, as reflected by the district court's opinion, 90 F.R.D. 358, 361 (E.D.La.1981), in 1981 those who had "monitored" the case as counsel for the NAACP filed a motion to intervene "not in the name of the NAACP but in the names of Trevor Brown, other identified proposed intervenors, and the class the named intervenors seek to represent." The class consisted of Louisiana black teachers, students and prospective students and their parents, and the district court stated "there can be no doubt that [the applicants] ... have a sincere and legitimate interest in the subject matter of this litigation." *Id.* at 360–61 & n. 1. However, it noted that the Louisiana NAACP president had publicly stated that he and "his organization" had "nothing to do with" the proposed intervenors. *Id.* at 361. On appeal, this Court observed "it was not clear that the proposed intervenors were the same as those who [had] moved for intervention in 1974." 669 F.2d at 315. Sustaining the denial of intervention, we went on to state:

> "As a general proposition, the timeliness of an application for intervention is an issue that addresses the discretion of the district court .... We cannot say, in view of the NAACP's great and undisputed delay—over four years—in advancing the second motion that the order denying it was such an abuse. *Nor was a hearing needed in such circumstances.*" *Id.* (emphasis added).

We also described the four-year delay in seeking intervention following the earlier appeal as "itself an adequate and sufficient ground for its denial." *Id.*

The parallels to the case at bar are striking. Though this action had then been pending and sporadically active for some seven years, we can for present purposes begin our detailed consideration of its procedural history in 1972 when plaintiffs filed a motion and an amended motion for further relief directed to the School Board's desegregation plan, which the district court had approved in February 1970, and especially requesting elimination of schools having a student "racial composition substantially disproportionate to the system-wide racial composition." In response, the United States moved that the district court appoint an eleven-person biracial Citizens Committee to develop a new desegregation plan. On March 20, 1973 the court, signing the form of order submitted by the United States, appointed such a committee, designating the same members and chairman suggested by the United States (five blacks, five whites, and a white chairman, voting only in case of a tie), and directing it

to conduct an investigation and develop a desegregation plan.

The Committee, among other things, held seven public hearings and twenty-one private meetings, and reviewed plans submitted by the School Board, the plaintiffs, various neighborhood groups, PTAs, and others. Its unanimous report, filed in June 1973, proposed a three-year plan, to be monitored by a court-appointed biracial Advisory Committee, whose full implementation "will bring about the conversion of the school district to a unitary system."

Plaintiffs ultimately moved that the Committee plan be approved, advising that "if implemented in toto, [it] will provide a unitary school system in Caddo Parish," and that although thirty-four one-race or predominantly one-race schools would remain, the "plaintiffs ... have concluded that there are sufficient facts extant and stated within the plan to fully justify the continued existence of these schools ...." [5] The United States in its "response" stated that "the Committee's recommendations should be implemented at the commencement of the 1973–74 school year." Although this response observed that "the plan provides for effective desegregation in certain formerly one-race or predominantly one-race schools," it went on to state:

"However, the student desegregation plan also proposes the continued operation of 34 one-race or predominantly one-race schools. With regard to these schools, the plan does not, as required by the March 20, 1973 order, state the facts relied upon to justify their continued operation, provide options to fully desegregate them, or state the feasibility of implementing all or parts of desegregation plans for these schools on record in this case. Of course, facts tending to demonstrate that the composition of a school is the result of de facto segregation unrelated to Board actions, or that desegregation of one-race schools can only be achieved through new school construction, or other facts may be relevant to the determination of whether desegregation steps are required in regard to such schools. Absent these determinations, we are unable to respond at this time to the question whether the plan in regard to these schools conforms with constitutional standards."

In essence, then, the United States' "response" was that the plan implementation should commence and, reminiscent of *NAACP v. New York*, that the plan might or might not be adequate but the United States did not have enough information to form a belief as to whether it actually was or was not adequate.

Approximately a week later, on July 20, 1973, the district court entered an order that the Committee plan "is hereby approved and made the order of this Court," and directed its implementation, commencing with the opening of the 1973–74 school year. At the foot of this order the United States made the following endorsement: "The present posture of this lawsuit considered, the United States ... interjects no objection to ordering implementation of this plan, as is more fully set out in its response filed herein."

The 1973–74 school year thus opened under the Committee plan, and a ten- or twelve-person biracial Advisory Committee, as provided for in the plan, was appointed

---

**5.** Previously the plaintiffs, through associate counsel, attorneys connected with the NAACP Legal Defense Fund, had objected to the Committee plan and requested disapproval of its student assignment provisions because it would leave too many elementary and junior high schools "racially identifiable," and had also moved to add as additional parties plaintiff several individual black students and their parents. Shortly thereafter the plaintiffs, through their original retained counsel, advised the court that they had discharged their Legal Defense Fund lawyers because of the objections they had filed to the Committee plan, and the district court then entered an order removing the Legal Defense Fund attorneys as associate counsel for plaintiffs and substituting the new counsel for plaintiffs whom they had requested in their motion. The objections to the plan were then stricken by the court on motion of plaintiffs through their new counsel. The court also denied the previous motion to add additional plaintiffs, without prejudice to its renewal by plaintiffs through their new counsel. It was not renewed. The United States took no position respecting any of these matters.

and commenced functioning with equal white and black membership, one of the latter being chairman.

In November 1973 several black parents and students (the same persons who had earlier sought to be made additional named plaintiffs, *see* note 5, *supra*) sought to intervene as plaintiffs individually and as representatives of a class or subclass of black students and parents. Their tendered complaint attacked the Committee plan approved by the court "because it maintains (without legal, educational or practical justification) racially identifiable and one-race schools within Caddo Parish." The motion to intervene acknowledged a difference of opinion in the black community and alleged:

"Applicants for intervention and the class or subclass they represent are not adequately represented by the original plaintiffs herein. *Nor are their interests protected by the United States of America . . . which acceded to the approval* and implementation *of the current plan* of operation . . . . *There is no relationship,* contractual or otherwise, *between applicants* for intervention or the said class or subclasses which applicants represent *and the United States,* except a statutory relationship pursuant to 42 U.S.C. § 2000c–6 . . . which authorizes the Attorney General of the United States to commence such litigation at his discretion. *Applicants* for intervention and the class or subclasses whom they represent *have no control, in law or in fact, over* the course of such litigation except insofar as *the Attorney General* or his representative chooses to hear, respect and act upon the wishes of applicants for intervention and the class." (Emphasis added.)

The district court denied the intervention without a hearing. The applicants appealed to this Court, where they were actively opposed by the plaintiffs. The United States took no position respecting the appeal. In August 1974 we reversed, holding "appellants are entitled to an evidentiary hearing on their motion to intervene." *Jones v. Caddo Parish School Board,* 499 F.2d 914 at 917.

No hearing was sought by the intervention applicants or anyone on behalf of the class or subclass they sought to represent, and for the next some two years the case was inactive and the school system continued to operate under the Committee's plan. In July 1976 the biracial Advisory Committee reported to the court that the School Board, though it had made definite progress, had not yet fully complied with the three-year desegregation plan established by the July 1973 order, and recommended a one-year extension of the plan to July 1977. In August 1976 the district court ordered the magistrate to take evidence respecting the School Board's compliance with the 1973 order. The School Board then filed a motion alleging that it had fully complied with the 1973 order and seeking a declaration of unitary status and dismissal of the suit. In November the United States filed its response to the School Board's motion, urging that dismissal should not be ruled on until it was determined whether the 1973 plan had been fully complied with. Later that month proceedings were held before the magistrate, and the record was forwarded to the district court.[6]

In January 1977 the plaintiffs filed a memorandum in opposition to the School Board's motion to dismiss, urging that "the plan to date has not been complied with. Therefore, the defendants' Motion to Dismiss should be rejected and the plan continued in effect until fully implemented." This was the first action in the case by plaintiffs since August 1974; it is also the last time that plaintiffs have taken any action in the suit. Also in January 1977 the United States filed a memorandum contending that the School Board had not fully complied with the 1973 plan and that it

---

**6.** The record reflects that in November 1976 "June Phillips, Professor, Southern University, Shreveport," was subpoenaed "as a witness to assist the Government at counsel table during the taking of depositions" in these proceedings. Concededly, this refers to our appellant.

should be required to file a report by March 13, 1977 showing its progress to that date "and any plans that it will implement in the future to meet the requirements of the July 20, 1973 order."

Nearly another year passed without any activity until, on December 30, 1977, the district court entered a memorandum ruling, finding that the Board had fully complied with the 1973 plan and that the district was unitary.[7] A judgment dismissing the suit was entered the same day. No appeal was taken from the order or judgment, and the plaintiffs filed no objection to either. However, on January 11, 1978 the United States moved to amend the court's judgment and findings on the ground that the only matter referred to the magistrate, and to which the parties had directed their evidence, was whether the Board had complied with the 1973 plan, so that the government did not have "adequate notice or opportunity for a hearing on the issue of dismissal" or of unitary status. It also contended that "the record is void of evidence on which this Court could base a finding" of unitary status. It accordingly prayed that the court "set an appropriate schedule for discovery and a hearing on the issue of whether the defend-

ants' current operation meets constitutional requirements." Similarly to its response to the 1973 plan itself, this motion of the United States did not take a position one way or the other as to whether, in actual fact, the 1973 plan, as implemented to January 1978, was or was not constitutionally adequate.

No action was taken on this motion of the United States, and the system continued to be operated under the 1973 plan. Nothing further transpired in the case for nearly two and a half years more until the above-mentioned June 2, 1980 status conference before Judge Stagg.[8]

Thereafter, the United States and the Board entered into widely publicized settlement negotiations lasting nearly a year, which led up to the execution of the Consent Decree in May 1981. Numerous public meetings (twenty-eight are listed in the papers filed by the Board below) were held throughout the community, principally in February, March and April 1981, to inform the citizens about various desegregation approaches and to obtain community input. Representatives of the Justice Department met with black civic leaders, and also received input from black citizen and parent groups.[9]

7.  The memorandum ruling notes that the Advisory Committee "composed of six blacks and six whites, has been in session constantly and regularly since the implementation of the plan" and "has held regular meetings and worked with the School Board through the four year existence of the plan." It also states that the School Board is elected from single-member districts and is composed of fourteen white and four black members, with a white president and black vice president, and that recently a "black, a woman teacher at Southern University" was appointed to the Board, by vote of its members, to fill a vacancy. Ms. Phillips' counsel, in argument to this Court, has acknowledged that she served on the School Board, and it is apparent that Ms. Phillips is the person who was so appointed. *See* note 6, *supra*.

8.  In July 1978 the Board filed a motion for partial relief from the 1973 plan, to which the United States filed a response urging that the Board's motion not be ruled on until the United States' January 1978 motion was determined. No hearing or ruling was ever had on these motions.

9.  We do not understand Ms. Phillips to claim otherwise. Certainly she has never questioned the numerous public meetings, or the fact that it was well-known that settlement negotiations were underway. The most she has claimed in this connection is that one *particular* individual Justice Department attorney (whom the record shows became head litigation counsel for the United States in November 1980 and whom Ms. Phillips alleged she believed primarily represented the United States in negotiating the decree) "never contacted" *her* and "to petitioner's knowledge ... never held any meetings in the Black community." This particular attorney verified the United States' response to Ms. Phillips' motion to intervene, specifying dates, places and attendees (not including Ms. Phillips) of occasions at which *he* met with representatives of the black community to receive their input into the settlement negotiation process. Moreover, as the record reflects, there were several other government attorneys active on the case. Indeed Ms. Phillips alleges that prior to the assignment of the above-referenced attorney another Justice Department attorney (whom she believed the above-referenced attor-

The Consent Decree was adequately publicized,[10] and Ms. Phillips (along with approximately fourteen other objectors and groups of objectors) timely filed her objection. This was wholly limited to claimed inadequacy in remedial programs for black preschool and elementary students, listed specific remedial programs for elementary and preschool black children which should be provided, and stated she "reserves the right to intervene ... on behalf of a class of Black persons whose children will need the [remedial] programs described above."

After expiration of the period for filing objections, Ms. Phillips filed her motion to intervene, later twice supplemented, in which her ultimate complaint is that the Consent Decree leaves too many predominantly one-race schools attended by too high a proportion of the black students. She alleged "that the United States has not represented the best interests of The Class" which she sought to represent.

Ms. Phillips specifically addressed the issue of timeliness in her motions to intervene, stating, "Mover shows that this intervention is timely because Mover presumed that the United States would represent the best interest of Mover and The Class which she seeks to represent" until she learned of the contents of the Consent Decree. But, as the district court stated in denying Ms. Phillips' motion, "The public had been kept well-informed of the progress of the parties' negotiations and were given every opportunity to voice their opinions in public meetings held in all parts of the parish."

Moreover, Ms. Phillips, who had been a participant in the November 1976 hearings, a School Board member thereafter and a parent of one or more children in the school system for several years, obviously was, or should have been, aware for many years not only of the mere pendency of the case but of her interest in it, and this is likewise obviously true of the class she seeks to represent. Indeed, Ms. Phillips has never denied this, either in the district court or on appeal.[11] Moreover, her claim is not that she was unaware of the prolonged, well-publicized settlement process, but rather that she did not know the United States would agree to this decree which she claims left too many predominantly one-race schools attended by too many black students. As her counsel candidly stated on oral argument, "She knew negotiations were going on. Sure. But she had no idea to what the United States was going to agree to until she saw the Consent Decree."

It is important to understand that the record clearly indicates, and Ms. Phillips has never disputed and indeed concedes, that the Consent Decree at the least materially reduces the number of predominantly one-race schools and of black students attending them as compared to the previously existing situation and the 1973 decree. It is unquestioned that the Consent Decree is a real improvement from the point of view of Ms. Phillips and the class she seeks to represent. Her point is that it is not

ney replaced), who was black, had "obtained input" from her and "held meetings in the Black community." She alleges no character of representations or assurances, express or implied, by this attorney (or anyone else).

10. We do not regard this as a matter of material dispute. Ms. Phillips alleged she "did not learn of the contents of the Consent Decree until the week of May 11, 1981 to May 15, 1981." The Board in its filings below and in this Court has stated that the decree was promptly published in its entirety in both local newspapers and widely publicized on television. On oral argument to this Court Ms. Phillips' attorney initially asserted that the decree "went in the newspaper like a news article" rather than verbatim in its entirety; however, he subsequently stated, "Now

I think the Consent Decree may have been published in toto in the newspaper," but, respecting the order allowing ten days to object, "if that order was published, I don't know about it. I haven't seen it." However, the Consent Decree itself also contains the ten-day objection period provision. In any event, Ms. Phillips has never contended, here or below, that the decree was inadequately publicized or that there was any material fact issue in that regard for which a hearing should be held.

11. In oral argument to this Court counsel stated, "I will concede that Ms. Phillips knew about the 1973 consent decree. She was on the Caddo Parish School Board at one time. She taught in the system."

*enough* of an improvement. Further, Ms. Phillips does not claim, and never has claimed, that the United States ever informed her or the class, directly or indirectly, that the United States would insist on a greater level of integration than that provided by the Consent Decree or that the United States changed from positions it had previously taken, publicly or otherwise, or in any sense switched directions, adversely to the interests she seeks to represent. Nor does the record suggest any such change in position or direction.

As the record clearly reflects, the 1973 plan was the product of a unanimous biracial Citizens Committee, arrived at after numerous public meetings, the Committee itself having been appointed and *each* of its members individually having been selected on the motion of the United States. The United States approved implementation of the 1973 plan, over the objections of those in the black community having the same viewpoint and concerns as Ms. Phillips, and until the Consent Decree, some eight years later, never did anything to attempt to bring about a level of integration beyond that of the 1973 plan. While it is true that the United States refused to agree that the 1973 plan was necessarily the last word, its consistent position in this respect was merely that the plan had not been proven to establish a unitary system rather than that it actually did not do so or could not be shown to. This, of course, was recognized by the previous applicants for intervention, whose pleadings averred that "their interests [are not] protected by the United States of America."[12]  In essence, the United States from 1973 to 1980 accepted the 1973 plan. If it has made any change in direction it is only that in 1981 it ceased to leave things on "dead center" and actually moved the school system to a materially more integrated condition.

In these undisputed circumstances, nothing in *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), *Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977), or *Piambino v. Bailey,* 610 F.2d 1306 (5th Cir.), *cert. denied sub nom. Piambino v. Sylva,* 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), suggests that Ms. Phillips' intervention was timely, or that the district court lacked discretion to determine it was untimely.

*Stallworth,* in addition to considering the factors of relative prejudice and unusual circumstances, to be addressed below, emphasizes the distinction, for purposes of determining when the timeliness clock starts to run, between "the date on which the would-be intervenor became aware of the pendency of the action" and "the date on which he learned of his interest in the case." *Id.* at 264.

The nature and purpose of such a distinction is aptly illustrated by the facts of *Stallworth.*  That was a Title VII suit by black employees against their employer, and the would-be intervenors (appellants) were white employees. A partial consent decree was entered March 7 which provided for abolition of departmental seniority. The employer had been engaged in a "rollback" since February, but prior to March 17 appellants had either been told by their employer they would not be rolled back or had retained their jobs while others were rolled back. Commencing March 17, however, by virtue of the Consent Decree, appellants (who claimed contract rights in their seniority) were rolled back while other employees, *white* as well as black, with less departmental seniority were not. Within three weeks appellants sought to intervene. They asserted that the Consent Decree was "unnecessarily broad" because its "abolition of the departmental seniority system enabled some *white* employees who

---

**12.** Indeed, Ms. Phillips' intervention states that the 1973 plan "did little for The Class which plaintiff [Ms. Phillips] seeks to represent," that "[t]he Class which she seeks to represent has not been well served by most of the actions of this court since the original filing of this suit," and

that "... the United States is supposed to represent all citizens of the United States and not the interests of any one group, including The Class which plaintiff [Ms. Phillips] seeks to represent."

were not members of the class affected by racial discrimination to pass the appellants on the seniority ladder." *Id.* at 262 (emphasis added). Ultimately, they complained of the decree *not* "insofar as it affected the rights of black employees, but only insofar as it affected the comparative seniority status of white employees." *Id.* We held the evidence showed "appellants did not know that their interests *might be affected by* a lawsuit until March 7." *Id.* at 267 (emphasis added). Naturally, the white employees had no reason to think their interests vis-a-vis *other whites* would be adversely affected by a racial discrimination suit filed by black employees. By contrast, it was surely *many years* before May 1981 when Ms. Phillips realized or should have realized that the interests she sought to advance by her intervention "might be affected by" this lawsuit.

The test we announced in *Stallworth* for this first factor was "[t]he length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case." *Id.* at 264. We arrived at this conclusion after reviewing *NAACP v. New York* and *United Airlines*, and we equated knowledge of "an interest in the case" with knowledge of an interest which "*might* be affected by" the outcome of the case. Nothing in *Stallworth* suggests that knowledge of the actual *outcome* of a case is necessary. And, while *Stallworth* holds that knowledge of mere pendency is not *necessarily* or inevitably knowledge of one's interest in the case, as it was not under the facts in *Stallworth*, nevertheless it recognizes that knowledge of the suit may indeed be "tantamount to knowledge" of one's interest in it. *Id.* at 264.[13] The widespread publicity

concerning and involvement of the black community with matters relating to this lawsuit, commencing in 1973 and also in respect to the many months of settlement negotiations, amply demonstrate the untimeliness of the May 1981 attempted intervention under this first *Stallworth* factor.[14]

*United Airlines* and *Piambino* are each plainly inapposite here. Each involved a sudden, complete reversal of position by the representative, which, absent the allowance of intervention, would have legally bound the would-be intervenors.

In *United Airlines* the intervenor's rights would have been barred by limitations, since avoidance of the bar depended on maintenance of the class action. The would-be intervenor had no notice of any impending settlement. The putative class representatives had previously attempted to appeal the denial of class certification, but the appeal was held premature since prior to final judgment. The Supreme Court noted that because of this "there was no reason for the respondent [would-be intervenor] to suppose that they [the putative class representatives] would not later take an appeal," 432 U.S. at 394, 97 S.Ct. at 2469, and hence intervention for the *sole* purpose of obtaining appellate review of *the denial of class certification, id.* at 392, 97 S.Ct. at 2468, was timely when sought within the period for notice of appeal (and virtually at the earliest time the sole purpose of the intervention, taking such an appeal, could be acted on).

Similarly, in *Piambino* a wholly meritorious appeal which had been undertaken with "a sterling brief" by parties on whom the would-be intervenor relied was suddenly wholly abandoned without warning despite

---

**13.** *See also e.g., Culbreath v. Dukakis,* 630 F.2d 15, 21 (1st Cir.1980) ("While, as alleged by the ... [would-be intervenors], knowledge of a suit is not necessarily knowledge of one's interest, in this instance, the existence of [the] interest was obvious, see *Stallworth v. Monsanto Co.,* 558 F.2d at 264, and the only lack related to its extent, a matter of degree, not of kind."); *United States v. Jefferson County,* 720 F.2d 1511, 1516 (11th Cir.1983).

**14.** *See, e.g., NAACP v. New York, supra* (*New York Times* article and "public comment by community leaders"); *Garrity v. Gallen,* 697 F.2d 452, 456 (1st Cir.1983) (media coverage); *Michigan Association for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir.1981) ("... this case has generated a great deal of public concern and scrutiny, and has thus received extensive media coverage"); *Culbreath v. Dukakis,* 630 F.2d 15, 21 (1st Cir.1980) (media coverage).

previous assurances "that they were prosecuting the appeal diligently and in good faith," 610 F.2d at 1325, and a settlement which "utterly destroyed" the would-be intervenor's rights was entered into without notice or opportunity to participate in its formulation.

Here, by contrast, the well-publicized settlement process dragged out over a year, and the ultimate result, which does not bind the would-be intervenors, involves no violation of assurances or reversal of position adverse to them. *Cf. United States v. Jefferson County*, 720 F.2d 1511, 1516–17 (11th Cir.1983) (distinguishing *United Airlines* on similar grounds in analogous case); *Garrity v. Gallen*, 697 F.2d 452, 458 (1st Cir.1983) (distinguishing *United Airlines* on similar grounds).

The second *Stallworth* factor is prejudice to the existing parties. Prejudice to the United States and the School Board is apparent. After nearly a year's negotiations they have finally arrived at a complex, interrelated settlement and consent decree disposing of the lawsuit between the two of them. If, as she requests, Ms. Phillips is made a party, there can be no consent decree without her agreement. Had Ms. Phillips intervened when she should have, she could have contributed to the settlement process, and quite possibly an agreement—surely different, and not necessarily only in ways favorable to Ms. Phillips' view, than the present one—could have been reached. To do so now, after positions have hardened, concessions here have been traded for those there, persons, groups, and institutions have "gone on the line" publicly, and months of effort and mobilization of community and citizen involvement have been expended, may be impossible. Whether impossible or not, all the time, effort, and meetings will have been wasted, and the lengthy and difficult process will have to begin all over again, from "square one" or worse.[15] The settlement here took longer and doubtless more

effort than a trial would. Certainly having to retry a case is recognized as prejudicial. *Cf. Piambino*, 610 F.2d at 1325 ("nor is it a case where more hearings must be held in the lower court"); *McDonald v. E.J. Lavino Company*, 430 F.2d 1065, 1071–73 (5th Cir.1970) (emphasizing that intervention being considered would *not* reopen litigation). Is not having to go through yet another, now perhaps futile, multimonth settlement negotiation and community meeting process prejudicial? We have plainly recognized this character of prejudice to existing parties in sustaining denial of intervention on grounds of untimeliness. *See, e.g., United States by Bell v. Allegheny-Ludlum Industries, Inc.*, 553 F.2d 451, 453 (5th Cir.1977) (per curiam), *cert. denied sub nom. United Steelworkers Justice Committee v. United States*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978) ("Intervention now for the purpose of challenging the consent agreement will prejudice the appellees by jeopardizing months of negotiations, causing substantial litigation expenses .... To allow the applicants to intervene now would disrupt carefully considered proceedings."). So have other courts. *See e.g., United States v. Jefferson County*, 720 F.2d 1511, 1517 (11th Cir. 1983) (intervention "would plainly have prejudiced the existing parties, since it would have nullified these negotiations ..."); *Culbreath v. Dukakis*, 630 F.2d 15, 22 (1st Cir.1980) ("... prevent last minute disruption of painstaking work by the parties and the court"); *Garrity v. Gallen*, 697 F.2d at 458 (same). As stated in *Alaniz v. Tillie Lewis Foods*, 572 F.2d 657, 659 (9th Cir.) (per curiam), *cert. denied sub nom., Beaver v. Alaniz*, 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978):

> "Intervention after entry of a consent decree is reserved for exceptional cases.
>
> " . . . .
>
> "Appellants sought intervention two and one-half years after suit was filed; they either knew or should have known

---

15. Prejudice to the United States as plaintiff is present in yet another way—it now has relief it is willing to accept, but if intervention is allowed it will no longer be assured of this, it will almost certainly not get exactly what it now has, and will in any event have to either get out of the suit or expend a great deal of further time and effort on it.

of the continuing negotiations. The crux of appellants' argument is that they did not know the settlement decree would be to their detriment. But surely they knew the risks. To protect their interests, appellants should have joined the negotiations before the suit was settled. Appellants have not proved fraudulent concealment. It is too late to reopen this action." (Footnote omitted.)

*See also Garrity v. Gallen, supra* at 455 (citing *Alaniz* ).

The third *Stallworth* factor is prejudice to the would-be intervenor. Nei-

ther Ms. Phillips nor the class she seeks to represent is bound by the Consent Decree, and she is free to file suit seeking further desegregation in the Caddo Parish school system, a matter which neither the United States nor the Board has disputed.[16] It is also important to realize in this connection that, so far as concerns the constitutional desegregation rights of Ms. Phillips and the class she seeks to represent, the Consent Decree is a floor, not a ceiling. It neither commands action claimed to violate the constitutional rights of Ms. Phillips or the class, nor forbids action to which Ms. Phillips or the class claim constitutional

---

16. The only parties to the Consent Decree are the United States and the Board and neither purports to be a party or signatory for or on behalf of anyone else or any class. The decree does not purport to speak to or govern the rights or obligations of any class or anyone else other than the Board and the United States. The decree provides:

"... it will be binding upon and shall have the effect of law with respect to the United States and its agencies, officers, agents and employees, and the Board and its officers, agents and employees."

The memorandum approving the decree states that "this case is not a class action" and that the only parties to the action are the United States and the School Board. Clearly the decree is not binding on anyone other than the United States and the Board. *See General Telephone Co. v. EEOC,* 446 U.S. 318, 333, 100 S.Ct. 1698, 1707, 64 L.Ed.2d 319 (1980); *United States v. Allegheny-Ludlum,* 517 F.2d 826, 845 (5th Cir.1975), *cert. denied sub nom.,* 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (the "class," not being a party, is not "bound by res judicata or estoppel to the consent decrees"); *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40, 65 (5th Cir.1974), *vacated on other grounds,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *Pearson v. Ecological Science Corp.,* 522 F.2d 171 (5th Cir.1975), *cert. denied sub nom. Skydell v. Ecological Science Corp.,* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976); *United States v. Board of Education of Chicago,* 88 F.R.D. 679, 683 (N.D.Ill.1981). *Cf. W.R. Grace & Co. v. Local 759,* 461 U.S. 757, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983).

The district judge correctly ruled that when Ms. Phillips sought intervention the case was not a class action. The Consent Decree does not purport to be a class judgment or to bind any class; nor does the order approving it. No party to the suit has ever requested a class certification order (or hearing); no one has ever been appointed class representative (the United States has never been appointed class representative, nor has it ever acted or purported to act

as such, as the district court correctly found); there has never been any class certification. *See* note 1, *supra.* In these circumstances, "the action is not properly a class action." *Baxter v. Palmigiano,* 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554 n. 1, 47 L.Ed.2d 810 (1976); *Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 430, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599 (1976); *Indianapolis School Comm'rs v. Jacobs,* 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). In *Baxter* Justice Brennan, joined by Justice Marshall, expressed disagreement with the majority's "not properly a class action" categorization, *id.* at 325 n. 1, 96 S.Ct. at 1561 n. 1, but of course we must look to the majority's statement. The doctrine that actions where there is no class certification and the judgment does not purport to be a class judgment are not class actions is not confined to mootness cases. *See, e.g., Lagorio v. Board of Trade of City of Chicago,* 529 F.2d 1290, 1291 (7th Cir.), *cert. denied,* 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976); *Davis v. Romney,* 490 F.2d 1360, 1366 (3d Cir. 1974). No complaint has been made of lack of class certification, and the district court cannot properly be faulted in this respect by reason of our prior opinion where the reference to class certification determination was clearly made in the context of the intervention hearing which we held the would-be intervenors were entitled to. *Jones v. Caddo Parish School Board,* 499 F.2d 914, 917–18 (5th Cir.1974) (per curiam). When thereafter the would-be intervenors failed to request a hearing for over six years, and the only action the named plaintiffs took in the suit was the filing of a memorandum in January 1977, the district court surely cannot be said to have violated our mandate. *Cf. United States v. Louisiana,* 669 F.2d 314, 315 (5th Cir.1982). Further, we have held that notice to the class of denial of class certification is not necessary. *See Pearson v. Ecological Science Corp.,* 522 F.2d at 176–77. *See also McGowan v. Faulkner Concrete Pipe Co.,* 659 F.2d 554, 558–59 (5th Cir. 1981) (by implication).

entitlement. In this regard, the decree is materially different, with respect to the would-be intervenor, than the decree in cases such as *Stallworth* or *Thaggard v. City of Jackson,* 687 F.2d 66 (5th Cir.1982), *cert. denied sub nom. Ashley v. City of Jackson,* —— U.S. ——, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983).[17] *See United States v. City of Jackson,* 519 F.2d 1147, 1151–53 (5th Cir.1975) (denying intervention to minority employees to challenge employment discrimination consent decree between United States and employer where decree did not limit minority employees' rights); *Ross v. Houston Independent School District,* 699 F.2d 218, 229–30 (5th Cir.1983). *Compare United States v. Jefferson County,* 720 F.2d 1511, 1518–19 (11th Cir. 1983) (denying intervention to white employees to challenge consent decree on grounds of reverse discrimination, since would-be intervenors were not bound). Moreover, in these circumstances, it is proper to "put into the balance against the movant its prior opportunities to assert its position." *United States v. Marion County School District,* 590 F.2d 146, 148 (5th Cir.1979).

The fourth and final *Stallworth* factor is "unusual circumstances." *Stallworth* provides two examples. First is the example of a would-be intervenor who, though "he failed to apply for intervention promptly after he became aware of his interest in the case," nevertheless makes a "convincing" showing "that for reasons other than lack of knowledge he was *unable* to intervene sooner." *Id.* at 266 (emphasis added). The second example is provided by the facts of *Stallworth* itself, where the district court, at the black plaintiffs' request, refused to allow the defendant employer to notify its white employees of the pendency and potential impact of the suit, which we characterized as "an unusual circumstance which tilts the scales toward a finding that the appellants' application was timely." *Id.* at

267. Nothing remotely comparable to either of these factors is present here.

█ It is true that the black community, as such, did not have in-court representation in the later phases of this case. This circumstance may be unusual in a statistical sense, but it does not militate strongly in favor of intervention where, as here, it is so plainly the result of free, deliberate choice. The black community has not been excluded. There is nothing secret or sudden about what has gone on. The black community has been involved and aware, this record reflects, at least since the biracial Citizens Committee was appointed and held public meetings in 1973. From that time until 1981 the biracial Advisory Committee monitored implementation of the 1973 plan. While the black community, as such, has not participated in the suit itself since January 1977 (and except for once then, not since 1974), that has plainly been its own free and deliberate choice. That choice does not justify *one person* coming along after all this time and attendant publicity and seeking to upset a settlement so long and so publicly in the making. If there is dissatisfaction, the courts remain open for another suit to seek *additional* desegregation, which is certainly not forbidden by the present decree.

While we focus on Ms. Phillips' situation and her obvious long-standing relation to this case, it is plain that she seeks intervention not to advance any uniquely individual claim, but rather to assert essentially the viewpoint of that segment of the black community for whom the 1973 would-be intervenors sought to speak. It cannot be gainsaid that that segment of the black community has for many years known its interests were at stake, and that there might be *no* more desegregation than that provided for in the 1973 decree, which is why they sought to intervene then. The plaintiffs, and "their" segment of the black community, approved the 1973 decree;

17. *But see,* as to the permissible scope of preclusion in any event, opinion of Justice Rehnquist, concurred in by Justice Brennan, dissenting from denial of certiorari in *Ashley v. City of Jackson, supra,* and *United States v. Jefferson County,* 720 F.2d 1511, 1518–19 & n. 20 (11th Cir.1983) (adopting analysis "paralleling" that of Justice Rehnquist's opinion in *Ashley*).

they have not challenged the Consent Decree and their desegregative interests are not adversely affected since the Consent Decree, as all admit, is significantly more desegregative than the 1973 decree.

Ms. Phillips does not seek limited purpose intervention. What she in effect asked of the district court, as she has of us, is full intervention and a completely new start. On the undisputed facts here, the district court did not abuse its discretion in denying her request. She timely submitted her objections to the decree—which she has now essentially abandoned—and these were considered and ruled on by the district court. It is now simply too late to require her intervention. Under the circumstances, the time has come for the United States and the Board to be allowed to settle their suit.

The district court did not abuse its discretion in determining that Ms. Phillips' application to intervene was untimely, and it accordingly did not err in denying her leave to intervene. Therefore, we AFFIRM the district court's denial of intervention as of right and DISMISS the appeal from the denial of permissive intervention.

PATRICK E. HIGGINBOTHAM, Circuit Judge, specially concurring:

While a strong argument can be made that the applicant for intervention was entitled to an evidentiary hearing before denial of her petition, it became plain in the en banc proceedings that she wanted no such hearing.[1] Instead, she rests on the assertion that as a matter of law she is entitled to intervene. I reject that proposition, concluding that, if the facts are as the applicant for intervention now concedes them to be, the district court did not abuse its discretion in refusing intervention.

I add this brief writing only to note that I share the concern for procedural regularity expressed by Judge Rubin's opinion and earlier by Judge Goldberg; this concern, I think, is shared by the members of the court on both sides of this case. Thus, despite the division of the court as to the outcome of this appeal, the case is a warning to courts struggling with public law cases. Difficult legal questions, particularly in school cases, are magnified by failure to adhere strictly to procedure. With these public law cases we are learning that the fastest path between two points is not a straight line. It is, instead, the sometimes tedious and seemingly tortuous path of procedural due process.

Some school cases have proceeded in ways more akin to congressional hearings than judicial proceedings. The very nature of the cases with their changing class memberships dulls sensitivity to otherwise routine procedures—procedures so routine that we overlook their fundamental due process role. When Judge Stagg inherited this snarled mass, it had lost many of its judicial features, and was a breeding ground for just the sort of difficulties this appeal has generated. Critically, failure to define the parties to this lawsuit in times past has led to difficulty in achieving a final result.

I am persuaded that, on balance, this record sufficiently reflects fundamental fairness and opportunity to be heard. Finally, if, as is the case, this uncertified "class" lacks sufficient definition as a jural entity to save a case from mootness, its "absence" from the negotiation of the consent decree cannot have unsettling consequences.

---

1. Phillips's original brief identified remand for a hearing as one option open to the court—the other two being an order vacating the consent decree and granting intervention, and a ruling in favor of the school board—but opined that such a hearing would be "a total waste of time." Phillips's second supplemental brief incorporates by reference the pleadings of her original brief and then specifically requests, *inter alia,* an order granting intervention; remand for a hearing on intervention is not listed even as an alternative form of requested relief. Finally, Phillips's fourth supplemental brief declares that such a hearing would be "a waste of judicial energy." From these statements we are entitled to infer that Phillips desires no hearing on intervention. I would not find that the trial court abused its discretion in denying what Phillips characterizes as a "total waste of time."

ALVIN B. RUBIN, Circuit Judge, with whom CLARK, Chief Judge, GOLDBERG, RANDALL, TATE and JOHNSON, Circuit Judges, join, dissenting.

Without holding a hearing, the district court denied as untimely a motion on behalf of a class of black parents and children seeking to intervene in this long-pending school desegregation case; the movant sought to object to a consent decree negotiated between attorneys for the United States Department of Justice and the School Board. The court also treated the case, instituted as a class action, as not being a class action although it had never held a class certification hearing as required by this court in a prior decision relating to the same case. *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir.1974). While the failure to hold a class-certification hearing was due to the failure of counsel for the putative class to seek such a hearing, the class-action allegations should not have been disregarded, and, once a consent decree was proposed, some formal action should have been taken on them. I would, therefore, remand the case for consideration of its class-action status and for a hearing on the motion to intervene.

## I.

Seven black school children and their parents filed a complaint in 1965 charging that the Caddo Parish public schools were being operated on a segregated basis in violation of rights secured to them by the equal protection clause of the fourteenth amendment. They sought to represent themselves and a class of "Negro children and their parents in Caddo Parish," pursuant to Fed.R.Civ.P. 23(a)(3) as then in effect. The case was assigned to District Judge Ben C. Dawkins, Jr., who enjoined the operation of the dual school system and ordered the School Board to prepare a desegregation plan. After the School Board had submitted a proposal, the United States moved to intervene as a party plaintiff pursuant to Title IX of the 1964 Civil Rights Act.[1] The district court adopted the School Board's plan and denied intervention by the United States. Both rulings were reversed by us in *United States v. Jefferson County Board of Education,* 372 F.2d 836 (5th Cir.1966), *aff'd with modifications,* 380 F.2d 385 (5th Cir.) *(en banc), cert. denied,* 389 U.S. 840, 88 S.Ct. 77, 19 L.Ed.2d 104 (1967). Since then, the United States has been an active participant.

The School Board thereafter prepared other plans. Each was approved by the district court and then disapproved by this court. *See Hall v. St. Helena Parish School Board,* 417 F.2d 801 (5th Cir.), *cert. denied,* 396 U.S. 904, 90 S.Ct. 218, 24 L.Ed.2d 180 (1969) (rejecting a freedom of choice plan), and *Jones v. Caddo Parish School Board,* 421 F.2d 313 (5th Cir.1970) (reversing the district court's approval of a plan submitted by the School Board and remanding for consideration of *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969) *(en banc), reversed,* 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970)).

In February 1972, plaintiffs filed a petition for further relief requesting the elimination of racially identifiable schools and professional staffs, and a declaration that the apportionment scheme for school board elections was unconstitutional. An amended motion for further relief focused on the School Board's failure to dismantle "schools with substantially disproportionate racial compositions" and sought the elimination of the remaining vestiges of the dual school system. The motion was signed by counsel who were associated with the NAACP Legal Defense Fund in New York City. The lawyer who appeared in this motion had not represented the plaintiffs originally, but had been listed on some of the previous filings as being associated with other Legal Defense Fund attorneys. While these motions were pending, Judge Dawkins recused himself from the case and it was assigned to Chief Judge Nauman S. Scott.

1. 42 U.S.C. § 2000h–2.

In March 1973, the United States responded to the motions for further relief by requesting that the court appoint a biracial committee of citizens of Caddo Parish ("the Committee") to assess the progress of the existing desegregation scheme and to develop alternate proposals. The district court ordered the establishment of such a committee, and the Committee presented its report and desegregation plan on June 1, 1973. Shortly thereafter, plaintiffs filed their objections to the pupil assignment portion of the Committee's proposed method of desegregation. They also moved to add additional parties as plaintiffs. The United States filed comments on the Committee plan, noting that the plan permitted the continued operation of thirty-four one-race or predominantly one-race schools. The United States stated that it was unable to determine whether the plan was constitutional because the plan did not, as required by court order, set forth facts that might justify continued existence of one-race schools.

Thereafter plaintiffs' original counsel moved to dismiss the lawyers from the Legal Defense Fund "because of the objections [they] filed to the Court Appointed Citizens Committee Desegregation Plan." The court signed an order submitted by plaintiffs substituting as their counsel yet another lawyer, who moved to strike the previously filed objections. About a week later the court adopted the Committee's desegregation plan and directed that it be implemented in time for the start of the 1973–74 school year.

Four months later, the Legal Defense Fund lawyers filed a motion to intervene on behalf of several black school children and their parents who resided in Caddo Parish. The named individuals sought to represent a "class of present and future black public schoolchildren who are or will be eligible to attend the public schools of Caddo Parish." They attached a complaint assailing the constitutionality of the Committee's pupil assignment plan for its retention of one-race schools within the parish. The district court denied the application for intervention, finding that the original plaintiffs adequately represented the class and that the motion to intervene was untimely. This court vacated that decision and remanded the case for an evidentiary hearing on the motion to intervene. *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir. 1974). We instructed the district court to "determine the class and who properly represents it." *Id.* at 917. However, no hearing was ever sought by the plaintiffs and none, therefore, was held.

For two years, there were no further legal proceedings and the Caddo Parish school system operated under the Committee's desegregation plan. In July 1976, the Citizens Advisory Committee, a group appointed to oversee the implementation of the 1973 plan, filed a report with the district court indicating several areas in which the School Board had not met the requirements established by the plan. That report recommended a one-year extension of the court order directing compliance with the 1973 Committee desegregation plan. After examining data submitted by the School Board, Chief Judge Scott appointed a Special Master "for the specific purpose of investigating, examining and producing evidence to enable the Court to determine the degree of conformity achieved by the Caddo Parish School Board in satisfying the conditions and provisions of the [1973] plan."

The following month, the School Board filed a motion with the district court seeking a declaration that the Caddo Parish school system was unitary and dismissal of this action. Opposing this motion, the United States stated that any declaration of unitary status prior to the completion of the Special Master's duties would be premature. The original plaintiffs, now represented by yet another lawyer as counsel,[2]

**2.** Why this lawyer appeared on behalf of the plaintiffs is not stated in the record. On September 15, 1976, he filed a notice of appearance as counsel and four months later he signed the memorandum in opposition to the School Board's motion. The memorandum does not refer to the lawyer who had previously appeared as original plaintiffs' counsel.

also filed a memorandum in opposition to the School Board's motion. On December 30, 1977, after considering deposition testimony, Judge Scott found that the "former state-imposed dual system had been completely eradicated" and declared the Caddo Parish school system "a unitary system." The same day he signed a judgment dismissing the suit.

Neither the United States nor the original plaintiffs appealed from this decision, but two weeks later the government moved to amend the district court's judgment and findings, claiming that there had been procedural irregularities in the proceedings held by the Special Master and substantive deficiencies in the determination that a unitary status had been achieved. No one appeared on behalf of the original plaintiffs. However, no action was taken on the motion and the judgment of dismissal remained on the record. In July 1978, the School Board requested that the district court lift the previously-imposed requirement that the faculty ratio be fifty percent white and fifty percent black. The United States filed an opposition to the School Board's request for partial relief, but, again, no one appeared on behalf of the original plaintiffs.[3]

On August 16, 1979, Chief Judge Scott recused himself and the case was transferred to a third district judge, Judge Thomas E. Stagg (who has since succeeded Judge Scott as Chief Judge). It was evident that at least some of the litigants or their counsel had permitted the case to languish. In both the public interest and the interest of the litigants, Judge Stagg promptly attempted to move the already-fourteen-year-old litigation to a conclusion. He convened a status conference, but only counsel for the School Board and the government appeared, and no lawyer appeared to represent either the original plaintiffs or those seeking to intervene. The next day, June 3, 1980, the court entered a minute order that provided in part:

If the original plaintiffs still have a viable interest in this case, their counsel should contact the court, in writing, within thirty (30) days of this order. If the plaintiffs' counsel does not respond, this court will consider that the plaintiffs acquiesce in having their interests represented by the United States as plaintiff-intervenor.

Copies of this were mailed to the many lawyers who had appeared in the past for, or who still were shown as representing, both the original plaintiffs and those seeking to intervene. While responses were received, in one form or another, from several lawyers who had appeared at one time or another to represent the plaintiffs, none indicated a present interest in the case and none objected to "having their [clients or former clients] represented by the United States as plaintiff-intervenor." No judgment based on the order was ever entered, no hearing was held with regard to the class action, no order with respect to the status of the case was entered, and no notice was given either to any of the plaintiffs or to members of the class.

At this point, the United States and the Caddo Parish School Board entered into negotiations in an attempt to arrive at a settlement. In the course of these negotiations, which lasted for almost a year, none of the plaintiffs or their counsel attempted to participate. On May 5, 1981, the United States and the School Board signed a settlement agreement. Two days later, pursuant to a joint motion of these two parties, the district court entered a consent decree embodying that agreement.

The order approving the consent decree directed the clerk of the court to give public notice of the terms of the decree. The district court also set a ten-day period in which "interested parties" could file written objections to the decree. Within that period, the court received fifteen objections, one of which was filed by June Phillips. Her objection was confined to the

---

**3.** The United States eventually moved to withdraw its objection to the School Board's request for partial relief on May 7, 1981, after the two parties had negotiated a consent decree. The court granted the United States' motion.

failure of the decree to provide "enrichment programs" for black students at many of the district's elementary schools. In addition, she specifically reserved "the right to intervene in these proceedings on behalf of herself or on behalf of a class of Black persons whose children will need" enrichment programs.

Four days after the period for filing objections had expired, Phillips filed a motion to intervene individually and on behalf of a class of black children in the Caddo Parish school system and their parents. Her petition alleged that there were numerous deficiencies in the pupil assignment plan contained in the consent decree and requested that the district court set the decree aside. On May 27, Phillips filed a first supplemental motion to intervene. On June 8, Phillips filed a second supplemental motion to intervene. That same day the United States and the School Board filed separate responses to the objections to the consent decree and memoranda opposing Phillips' attempt to intervene.

The district court denied Phillips' motion to intervene on June 17, 1981. It found both that her proposed intervention was untimely and that it failed to raise any issues that had not previously been considered by the School Board and the United States. On July 2, the district court overruled all objections to the consent decree. Phillips appeals from the denial of her intervention and the rejection of her objections to the consent decree. Taking the opposite tack from the parties to the consent decree, she does not seek merely a hearing. She also seeks orders permitting her to intervene both individually and as a class representative, setting aside the consent decree, directing the district court to appoint experts to help formulate a new plan, and requiring all parties to file new plans "with as many alternative methods of desegregating the system as possible."

## II. CLASS ACTION

In its memorandum ruling denying Phillips' intervention, the district court found that "this action, in its present posture, is not in fact a class action." The court reasoned that the action brought by the private plaintiffs, despite allegations of a "class" status, had never been certified as a class action and that the United States had never been designated as a class representative. In describing the history of the case, the court noted that the original plaintiffs had not taken an "active role in this litigation for some time," prior to June 1980, and that none of these plaintiffs or their counsel had responded to the June 3 minute entry. The court therefore viewed the settlement negotiations and the resulting consent decree as the efforts of the only two remaining parties, the School Board on one side and the United States on the other.

The historical facts recited by the district court are clearly correct. However, the fact that nothing had been done about class certification did not ipso facto determine that this was not a class action.

The June 3 minute entry neither purported to be nor was either a dismissal of the class action or a refusal to certify the plaintiffs as class representatives. While some of the lawyers who had appeared for the plaintiffs responded to the court that they were no longer in the case, none of them indicated to the court that the *parties* had been consulted by them or that the parties did not wish to prosecute the class action. The situation was much as if the lawyers had withdrawn, leaving the plaintiffs in the lawsuit unrepresented. Thereafter, no further action was taken on this order.

While the June 3 minute entry had stated, "... this court will consider that the plaintiffs acquiesce in having their interests represented by the United States," the district court's opinion denying Phillips' intervention said:

The government has never been designated as a class representative, *nor ... has it ever "purported" to represent a class. The government has "represented" parties in this case only in the sense that it is "entitled to the same relief as if it had instituted the action"*

under Title IX of the Civil Rights Act of 1964 .... (Emphasis added.)

At least, however, until the court found that the government did not represent the original plaintiffs' interests, those plaintiffs might be justified in assuming that it was doing so.

When the suit was filed, no class certification order was necessary. In 1966, Rule 23 was amended to require the plaintiffs in a class action to apply for class certification. The amendment applied to pending cases. Eight years later no action had been taken to certify the class, so we ordered a class action hearing. *Jones v. Caddo Parish School Board*, 499 F.2d 914, 917 (5th Cir.1974). Now, ten years after our mandate issued, there has still been no determination whether the action should be maintained as a class action. Rule 23(c)(1) provides that the court shall make such a determination "as soon as practicable after the commencement of an action brought as a class action." [4] While it was the responsibility of the parties to move for a hearing under Rule 23(c)(1), their failure to do so did not absolve the district court of responsibility. It should have held a hearing *sua sponte*, even if only to determine whether the class representatives would fairly and adequately represent the class. "The trial court has an independent obligation to decide whether an action was properly brought as a class action, even where neither party moves for a ruling on class certification." *McGowan v. Faulkner Concrete Pipe Co.*, 659 F.2d 554, 559 (5th Cir.1981).[5] Especially when an appellate court has specifically ordered that a class action hearing be held, the district court should see that the class is either certified or that the suit is not properly maintainable

as a class action. That hearing should now be held.

On occasion, the Supreme Court has held that a district court's failure to certify an action as a class action deprives the case of its class action status. *See Baxter v. Palmigiano*, 425 U.S. 308, 310 n. 1, 96 S.Ct. 1551, 1554 n. 1, 47 L.Ed.2d 810, 816 n. 1 (1976); *Pasadena City Board of Education v. Spangler*, 427 U.S. 424, 430, 96 S.Ct. 2697, 2702, 49 L.Ed.2d 599, 605 (1976); *Board of School Commissioners v. Jacobs*, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975). Those cases, however, deal solely with mootness and do not purport to determine "whether, for example, a court of appeals may treat an action as a class action in the absence of formal certification by the district court." *Baxter*, 425 U.S. at 325 n. 1, 96 S.Ct. at 1561 n. 1, 47 L.Ed.2d at 825 n. 1 (Brennan, J., dissenting). Furthermore, in none of those cases had an appellate court directed that a class certification hearing be held.

I would not now decide the effect of possible certification of a class on the consent decree negotiated by the United States and the School Board, an issue that has not been briefed or argued by the parties.

## III. TIMELINESS OF INTERVENTION

When the consent decree was presented to the district court, the court entered it without a hearing and allowed ten days in which post-entry objections could be filed. Within that time, Phillips filed objections reserving the right to intervene. On May 22, fifteen days after publication of the consent decree, she sought to intervene on behalf of a class of black parents and students. She thereafter filed supplemental

**4.** *See* Manual for Complex Litigation § 1.40, at 16 (5th ed. 1978) ("The mandatory language of Rule 23(c)(1) is based upon sound and urgent practical considerations. If the determination whether the action should proceed as a class action is delayed, serious injustices may result, and avoidable procedural errors of great magnitude may ensue.")

**5.** *See* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1785, at 128 (1972); *see also* Manual for Complex Litigation, *supra* note 5,

§ 1.40, at 16 ("If class action proceedings are initiated by the court *sua sponte* by means of an order to show cause, in determining the certification question, the court should make tentative written determinations, including the requisite findings of fact under subdivisions (a) and (b) of Rule 23 and should, in an evidentiary hearing, afford the opposing party or parties an opportunity to refute such findings.") (footnote omitted).

motions to intervene. Without a hearing, the district court denied her intervention as untimely on its face.

Even though factual allegations are not required by notice pleading,[6] Phillips' pleadings contained allegations that sufficed to show both her interest in the litigation and the timeliness of her assertion of it. She alleged that, although the June 3 minute entry appeared to have designated the United States as the sole representative of the class of black students and their parents, the government had failed to protect their interests in negotiating the consent decree. Phillips proposed to intervene to represent the class adequately. In her first supplemental motion to intervene, filed on May 27, Phillips further asserted that her intervention was timely because she had assumed that the United States was adequately representing the black families of Caddo Parish until she learned the contents of the consent decree—which she said she first learned during "the week of May 11, 1981 to May 15, 1981." She alleged that, sometime between November, 1980, and March, 1981, the United States had changed trial attorneys,[7] and that the new attorney had not, to her knowledge, "held any meetings in the Black community," nor had he communicated with her personally.[8]

If proved, these factual allegations, though unnecessary, would establish timeliness under the well-settled law of this circuit. Indeed, in its brief on rehearing en banc the United States "agrees that timeli-

ness under Rule 24(a)(2), Fed.R.Civ.P., must be measured from the date that the alleged inadequacy of representation first arose."

The Supreme Court has defined the timeliness requirement as being met when, "as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests." *United Air Lines v. McDonald*, 432 U.S. 385, 394, 97 S.Ct. 2464, 2470, 53 L.Ed.2d 423, 432 (1977). Assuming, as we must at this stage in the proceedings, the truth of Phillips' allegations, she did just that. She was not required to do more. Although in her first supplemental motion she attempted to negate the possible defense that her intervention was untimely, she was not obliged to do so; such an issue must be raised by the opponent as a defense and its merit is best determined in a hearing.

Our timeliness standard follows *United Air Lines*. We have twice discussed the factors that ought to be considered in making a timeliness determination. In *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir.1977), and in *Piambino v. Bailey*, 610 F.2d 1306, 1320–21 (5th Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 568, 66 L.Ed.2d 469 (1980), we set them forth as follows:

(1) the length of time during which the would-be intervenor actually knew or

---

**6.** Rule 24 states the procedure for intervention: "A person desiring to intervene shall serve a motion to intervene upon the parties. . . . The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought."

**7.** The record shows that the United States changed trial attorneys in November 1980.

**8.** The United States and the School Board assert that in February, March, and April of 1981, a number of public meetings were held throughout the community to inform citizens about various desegregation approaches and to allow for community participation. The United States further asserts that Justice Department representatives met with black civic leaders and solic-

ited the views of black citizen and parent groups. Whether such meetings were in fact held is a factual question that should have been resolved at an evidentiary hearing. Another disputed question of fact is the extent to which the consent decree was publicized after it was entered. The School Board contends that it was published in its entirety in the two local newspapers and was covered by three local television stations. Phillips denies this.

Even if the allegations of the School Board and the United States were proved, Phillips' motion would not necessarily be untimely. The ultimate question for the district court would be when she knew or should have known that her interests were not adequately represented.

reasonably should have known of his interest in the case before he petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

Phillips' allegations, if proved, would have established timeliness,[9] but the district court denied her motion to intervene without granting her a hearing in which she could establish their verity or in which the School Board and the Justice Department might negate them. As we have repeatedly held, such a hearing is a minimal step necessary to comport with due process.

> When parents move to intervene in school desegregation cases, the important constitutional rights at stake demand a scrupulous regard for due process considerations. *Jones v. Caddo Parish School Board,* 499 F.2d 914 (5th Cir.1974). This court has determined that intervention, rather than a separate action, is the proper vehicle for parents claiming inadequate representation to assert their rights. Denial of a plea in intervention, therefore, often will deprive those parties of their only opportunity to be heard. Consequently, we adhere to our earlier decisions requiring the district court to conduct an evidentiary hearing, and to enter findings based upon an adequate record. *Jones v. Caddo Parish School Board,* 499 F.2d 914

(5th Cir.1974); *Calhoun v. Cook,* 487 F.2d 680 (5th Cir.1973). See also *United States v. Perry County Board of Education,* 567 F.2d 277 (5th Cir.1978).

*Adams v. Baldwin County Board of Education,* 628 F.2d 895, 897 (5th Cir.1980).[10]

The district court made what appears to be a factual finding concerning Phillips' failure to act timely: "Surely she cannot contend that the extended and well-reported events of the past months escaped her notice." But Phillips does not appear to contend that she did not know of the negotiations. She does contend that, until the consent decree was entered, she was not aware of the inadequacy of the Justice Department's representation of her interests and those of the class she sought to represent. There was indeed no evidence concerning when Phillips first became aware that the Department allegedly no longer adequately represented her or the class's interests.

The district court's ruling that Phillips' intervention motion was untimely rested on narrow grounds. The court simply noted that, because she failed to participate in formulation of the consent decree, her efforts to "second-guess" that decree came too late. The district court thus focused on the one factor we have disapproved in Rule 24 timeliness decisions. "[T]he timely application requirement under Rule 24 was not intended to punish an intervenor for not acting more promptly but rather was designed to insure that the original parties should not be prejudiced by the intervener's [sic] failure to apply sooner." Note, The Requirement of Timeliness Under Rule 24 of the Federal Rules of Civil Procedure, 37 Va.L.Rev. 863, 867 (1951), *quoted in McDonald v. E.J. Lavino Co.,* 430 F.2d 1065, 1074 (5th Cir.1970).

**9.** *Accord Lelsz v. Kavanagh,* 710 F.2d 1040, 1044 (5th Cir.1983). Other circuits have also recognized this as the crucial test in class actions. *See Hill v. Western Electric Co.,* 672 F.2d 381, 386 (4th Cir.1982); *Legal Aid Society v. Dunlop,* 618 F.2d 48, 50 (9th Cir.1980).

**10.** *Cf. Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425 (5th Cir.1983) (parents'

motion to intervene in school desegregation case denied *after* hearing); *United States v. Perry County Board of Education,* 567 F.2d 277 (5th Cir.1978) (when parents sought to intervene on grounds *unrelated* to desegregation, district court properly denied intervention without a hearing).

The intervention effort cannot be held untimely solely because of the length of time that had passed between the original filing of the suit and either the entry of the consent decree or the filing of the motion to intervene. This sort of "absolute" measure of timeliness is a factor that we expressly said in *Stallworth* should be "ignored." 558 F.2d at 266. *See also Reeves v. IT & T,* 616 F.2d 1342, 1349 (5th Cir. 1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981).

In *United Airlines,* the Supreme Court ruled that a party might intervene even after judgment for the purpose of prosecuting an appeal that the named parties did not choose to pursue. In both *Piambino* and *Stallworth,* we allowed parties to intervene after discovering, when consent decrees were filed, that their interests were adversely affected. In *Piambino,* the intervention motion was filed seventeen days after the intervenor learned his interests were not being adequately represented; in *Stallworth,* the delay was twenty-eight days. Phillips contends that she did not learn of her interest until at least May 11; if that allegation is proved, her delay in moving to intervene amounts to only eleven days. Even if timeliness is measured from the entry of the consent decree on May 7, a delay of fifteen days is not unreasonable compared to those allowed in *Piambino* and *Stallworth.*

In addition, the district court made no findings on the three other factors *Stallworth* tells us to consider: prejudice to the existing parties; prejudice to the intervenor; and unusual circumstances.

Consideration of prejudice to existing parties if the intervention is allowed is critical. Indeed, in *McDonald v. E.J. Lavino Co.,* 430 F.2d 1065, 1073 (5th Cir.1970), we explained that this was "the most important consideration" and that "courts are in general agreement that an intervention of

right under Rule 24(a) must be granted unless the petition to intervene would work a hardship on one of the original parties." Prejudice is the heart of the timeliness requirement. "[T]he prejudice ... that is relevant is only that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he knew ... about his interest in the action." *Stallworth,* 558 F.2d at 265.[11] Without a hearing, we cannot know whether or not either the United States or the School Board would have been prejudiced at the time intervention was sought.

The district court also did not address the prejudice that would result to Phillips and the class she sought to represent if she were *not* permitted to intervene. Yet that is the third factor identified by *Piambino* and *Stallworth* as minimally necessary to a resolution of the timeliness question. To some extent, this prejudice is self-evident. The class was not represented in the final resolution of a lawsuit that will have a significant impact on the education of its children. The United States was the only party even putatively adverse to the School Board, and its status was that of a party plaintiff, not that of a representative of any class. *See* 42 U.S.C. § 2000h–2 (1976).

The final timeliness factor that the district court must consider under *Stallworth* and *Piambino* is the existence of special circumstances. This factor was also pretermitted by the district judge's opinion. Although Phillips should have had the opportunity to present evidence on any special circumstances that might be present in the case, at least one is obvious: the fact that this school desegregation case was resolved without any in-court representation of the black community of Caddo Parish.

A hearing on the motion to intervene would have required little time. The mo-

---

11. The district judge did not explicitly address the question of prejudice, but he did refer to the disruption Phillips' intervention would cause after "the months of turmoil and negotiations carried on by the parties." Even assuming that this is an oblique evaluation of prejudice to the existing parties, the court could not properly address the question of prejudice until it had first determined, on the basis of evidence, when Phillips knew or should have known that her interests were adequately represented; the two inquiries are intertwined.

tion might or might not have been granted. The district judge might have allowed Phillips to intervene either as a party or for the limited purpose of objecting to the consent decree. If granted, Phillips' intervention would not necessarily have resulted in setting aside the consent decree; it would have assured only that Phillips and the class she sought to represent had a chance to challenge the decree in court.

The Department urges, correctly, that even now Phillips has the right to file a new suit contesting the consent decree and seeking changes in the Caddo Parish school system.[12] While she assuredly has that right, its exercise would be at least as dilatory and even more inefficient in securing an adjudication of her right to seek changes in the school system, and, should that be recognized, the merit or lack of merit of her position. The preferred course of action for parental groups who have an interest in desegregation litigation is to intervene in a pending action, not to file separate lawsuits of their own. *Hines v. Rapides Parish School Board,* 479 F.2d 762, 765 (5th Cir.1973). In *Hines,* we sought to prevent the "fostering [of] a multiplicity of new lawsuits over the same complicated and emotional issues which have already once been fought out in an all too lengthy court battle." *Id.* That objective applies equally here.

## IV. ADEQUACY OF REPRESENTATION

One of the requirements for intervention of right under Rule 24(a)(2), in addition to timeliness, is that the movant's interests are not adequately represented by the existing parties. As an alternative ground for denying Phillips' motion to intervene, the district court held that Phillips raised no new issues and that she raised no significant issue that she could "best represent." *See Hines v. Rapides Parish School Board,* 479 F.2d 762, 765 (5th Cir.1973). This question of adequacy of representation, like that of timeliness, should not have been resolved without a hearing. *See Adams v. Baldwin County Board of Education,* 628 F.2d 895, 897 (5th Cir.1980).

In her motion and supplemental motions to intervene, Phillips raised several objections to the consent decree, the most significant of which is that it does not adequately desegregate the Caddo Parish school system because forty-seven percent of the black students remain in predominantly black schools. Without a hearing, the district court accepted the contentions of the School Board and the government that Phillips' figures were "inflated." Due process requires that Phillips be afforded a hearing at which she may offer evidence in support of her claims.

Like many lawyers, Phillips' counsel sought more than we now allow: he urged

12. Because the only parties to the consent decree are the United States and the School Board, neither Phillips nor the class she seeks to represent are bound by the decree. *Cf. General Telephone Co. v. EEOC,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (when EEOC sues employer in its own name, and not as certified representative of a class, individual employees are not bound by relief obtained under EEOC settlement or judgment against employer). Nor would a separate lawsuit filed by Phillips necessarily be barred by *Thaggard v. City of Jackson,* 687 F.2d 66 (1982), *cert. denied sub nom., Ashley v. City of Jackson,* — U.S. —, 104 S.Ct. 255, 78 L.Ed.2d 241 (1983). In *Thaggard,* a group of white plaintiffs sued the city of Jackson, contending that the city practiced reverse discrimination. The city answered that the challenged practices were mandated by consent decrees entered in previous employment discrimination cases. The white plaintiffs had been denied intervention in those cases. We held that the white plaintiffs' suit against the city was an impermissible collateral attack upon the consent decrees. We found that the white plaintiffs' claims in *Thaggard* would have required the court to decide, first, whether the challenged actions were in compliance with the consent decrees, and second, whether the consent decrees themselves were illegal. If Phillips were to file a separate lawsuit against the School Board, however, her complaint presumably would be directed, not at segregation *caused by* the consent decree, but at segregation that preexisted the consent decree and was not remedied by it. *Cf. Ross v. Houston Independent School District,* 699 F.2d 218, 229–30 (5th Cir. 1983) (denial of leave to amend pleading on grounds of undue delay does not bar filing of new suit raising issues asserted in proposed amendment).

us simply to permit intervention. He did not thereby waive Phillips' right to a hearing if we did not grant her a whole-loaf of relief, and unlike my brother Higginbotham, I cannot view counsel's pressing for complete victory as a waiver of Phillips' constitutional right to be heard.

The interests of Phillips and the United States cannot be considered identical simply because both seek desegregation. Clearly, Phillips is dissatisfied with the level of segregation that the government is willing to accept. As in a previous round of this litigation, we are faced with a putative class "who desire the achievement of greater desegregation than is necessary to satisfy plaintiffs [now, the United States as plaintiff-intervenor]." *Jones v. Caddo Parish School Board,* 499 F.2d 914, 917 (5th Cir.1974).

Some courts have imposed a heavier burden on a movant who alleges inadequate representation by the government, as opposed to a private existing party. *See* 7A C. Wright & A. Miller, Federal Practice and Procedure § 1909, at 528 n. 85 (1972), and cases cited therein. But Phillips may meet that burden if she makes "a concrete showing of circumstances in the particular case that make the representation inadequate ... [I]ntervention will be allowed if ... for any ... reason it appears that the representative is not making a diligent effort to protect those whom he represents." *Id.* at 529–30 (footnotes omitted). An interest in a different sort of remedy from that the government desires is sufficient to support intervention of right.[13] Similarly, intervention of right may be allowed when the movant demonstrates greater enthusiasm than the government in pressing a particular claim.[14]

## V. CONCLUSION

For these reasons, the case should be remanded to the district court with directions to hold a hearing to determine whether it should be certified as a class action and whether Phillips should be permitted to intervene. I, therefore, respectfully dissent.

---

**13.** *Cf. Cohn v. EEOC,* 569 F.2d 909, 911 (5th Cir.1978) (intervention allowed when government's interest was in contesting contempt for violating consent decree, and movants' interests were in narrowing range of possible sanctions).

**14.** *See United States v. Georgia,* 428 F.2d 377 (5th Cir.1970) (in school desegregation suit brought by United States, community residents allowed to intervene to attack parts of order that United States failed to appeal).