GARWOOD, Circuit Judge:
Plaintiffs-appellants Kevin Paul Cavalier and Julie Ann Cavalier (the Cavaliers), on behalf of their minor son, Hunter Cavalier, appeal the summary judgment dismissal of their lawsuit against defendant-appellee Caddo Parish School Board (School Board) complaining that the School Board illegally discriminated against Hunter Cavalier on the basis of his race when he was denied admission to Caddo Middle Magnet School.[1] We reverse and remand.
Facts and Proceedings Below
In 2002, Hunter Cavalier (Hunter), who is white, applied for admission to the sixth grade at Caddo Middle Magnet School (CMMS), an academic and performing arts magnet school covering grades six, seven and eight, for the 2002-2003 school year. His application was denied because his achievement test score was not high enough for a white student applicant, although it was high enough for a black student applicant. The Cavaliers claim that but for a race-conscious admission policy, Hunter would have been admitted to CMMS. The School Board has not denied this.
The School Board has admitted that its admission policy for CMMS does employ racial classifications in order to meet a *248 particular racial balance at CMMS. The procedure for admission to CMMS is contained in School Board Policy JECC. To qualify for admission to CMMS, an applicant must: 1) have high motivation toward excellence, as evidenced by consistent achievement and acceptable behavior; 2) be performing on grade level or better; 3) have a grade point average (GPA) of 2.0 or better in reading and math and 2.5 or better overall; and 4) have 95% or better attendance. In addition, the student must take a standardized achievement test, the California Achievement Test (CAT), for ranking purposes.[2]
After the initial qualifications are taken into account, the number of qualified applicants usually far exceeds the number of available openings. To determine which students will be offered admission, CMMS gives priority to qualified siblings of students who also attend CMMS and to black students who would otherwise attend a school with over 90% black student enrollment. CMMS then ranks the remaining qualified applicants based on their CAT test score. Regarding these latter rankings, the policy states that CMMS “will maintain a list of rankings for black students and a list of rankings for white students.” The vacancies are then filled so that CMMS will have a racial mix of 50% white and 50% black, plus or minus 15 percentage points.[3] CMMS accepts qualified applicants of any race subject to the number of openings available by race, according to the required racial mix, and no applicant of any race who does not meet the initial admission requirements is accepted.
Hunter met the initial admission requirements for entrance into CMMS for the 2002-2003 school year. However, based on his CAT test score, and due to the number of slots available for white students, he was not admitted.
For the 2002-2003 school year at CMMS, the lowest CAT test score for a nonsibling white applicant given admission to the sixth grade was 142; the lowest CAT test score for a nonsibling black applicant given admission was 117. Hunter’s CAT test score was 140. There were seven nonsibling white applicants not selected for admission who had scores of 141 and six, including Hunter, who had scores of 140. Sixty-seven black students who scored less than Hunter (140) on their CAT test were admitted to the sixth grade.
The 2002-2003 sixth grade CMMS class consisted of 449 students. Fifty-one siblings were admitted, of whom 42 were white and 9 were black. Another 398 non-sibling students were admitted on the basis of their CAT test score ranking, of whom 259 were white and 139 were black. While the incoming sixth grade class was 67% white and 33% black, the total student composition of CMMS for the 2002-2003 school year was 65% white and 35% black, a result barely within the School Board-required racial mix for CMMS of 50% black/white, plus or minus 15 percentage points.[4]
*249 The Cavaliers, on behalf of Hunter, filed suit against the School Board, and twelve of its members, alleging that Hunter was discriminated against on the basis of his race when he was denied admission to CMMS. The Cavaliers sought declaratory and, injunctive, compensatory damages, and attorneys’ fees and costs, under the Fourteenth Amendment and 42 U.S.C. §§ 1981, 1983, and 2000d. The parties consented to the exercise of jurisdiction by a magistrate judge, and the district court referred the case to a magistrate judge. The School Board filed a motion to dismiss or for summary judgment on the ground that the admission procedure for CMMS is pursuant to a court-ordered consent decree and, therefore, is constitutional. The magistrate judge granted the defendants’ motion, dismissing all claims against all parties.[5] The Cavaliers subsequently filed a timely motion for reconsideration, which the magistrate judge denied. The Cavaliers then timely appealed.
Discussion
The Board attempts to justify its admission policy based on a consent decree entered in 1981 involving the Board. Because this consent decree no longer applies to CMMS, it cannot justify the Board’s policy, and because the Board shows no other compelling governmental interest for its racial classification, we hold that on this record it was error to grant the School Board’s motion for summary judgment and the policy is unconstitutional. Furthermore, because the Board has not shown that it has considered any race-neutral means to achieve its desired racial mix and relies exclüsively on a racial quota, the policy is not narrowly tailored. Therefore, we reverse and remand.[6]

*250
I. Standard of Review

We review de novo the magistrate judge’s grant of summary judgment.[7] Austin v. Will-Burt Co., 361 F.3d 862, 866 (5th Cir.2004). Summary judgment is proper only if, viewing the evidence in the light most favorable to the nonmoving party, the record establishes “that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. R. Civ. P. 56(c).

II. Constitutionality of the Admission Policy

A. Strict Scrutiny Review

We apply strict scrutiny review to the School Board’s race-conscious admission policy: “It is by now well established that ‘all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.’ ” Gratz v. Bollinger, 539 U.S. 244, 128 S.Ct. 2411, 2427, 156 L.Ed.2d 257 (2003) (quoting Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 115 S.Ct. 2097, 2111, 132 L.Ed.2d 158 (1995)) (emphasis added). To pass strict scrutiny review, the School Board must demonstrate that the “use of race in its current admission program employs ‘narrowly tailored measures that further compelling governmental interests.’ ” Gratz, 123 S.Ct. at 2427 (quoting Adarand, 115 S.Ct. at 2113) (emphasis added).

B. Compelling Governmental Interest

1. Remedying Current Effects of Past Segregation

Because the School Board previously operated a dual school system, in violation of the Fourteenth Amendment, it bears the “primary responsibility to ‘eliminate from the public schools all vestiges of state-imposed segregation.’ ” Davis v. East Baton Rouge Parish Sch. Bd., 721 F.2d 1425, 1434, 1436 (5th Cir.1983) (quoting Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 2762, 53 L.Ed.2d 745 (1977)). Remedying the present effects of past discrimination is a compelling interest that in particular circumstances may justify appropriate use of certain racial classifications. Dallas Fire Fighters Ass’n v. City of Dallas, Tex., 150 F.3d 438, 441 (5th Cir.1998).
In justifying its admission policy, the School Board has relied exclusively on a consent decree entered by the Western District of Louisiana in 1981 directing the desegregation of the Caddo Parish school system (the 1981 Consent Decree). The School Board has not identified any current effect or condition at CMMS that is traceable to the past segregation within the school system.[8] Therefore, whether the School Board’s use of racial classifications serves a compelling governmental interest by seeking to remedy the current effects of past segregation depends entirely on whether the 1981 Consent Decree obligates the School Board to use racial classifications in its current admission poli *251 cy. As we conclude that the 1981 Consent Decree is no longer applicable to CMMS, it cannot justify the School Board’s race-conscious admission policy.

a. Background of the 1981 Consent Decree

The 1981 Consent Decree has it roots in litigation that began in 1965 and that has been the subject of multiple cases within this circuit. The following historical background comes from two earlier cases involving the 1981 Consent Decree: Jones v. Caddo Parish School Board, 735 F.2d 923, 924-26, (5th Cir.1981) (Jones I), and Jones v. Caddo Parish School Board, 204 F.R.D. 97, 98-100 (W.D.La.2001) (Jones II):
In 1965, the parents of seven black children commenced a suit against the School Board seeking desegregation of the Caddo Parish public schools. The United States later intervened as a plaintiff. In 1973, the district court ordered the School Board to implement a desegregation plan; a plan was developed and took effect. In 1976, the School Board filed a motion to have the school system declared unitary, which would have warranted the dismissal of the original suit; however, the United States opposed the motion. In 1977, the district court: (1) ruled that the School Board had fully complied with the 1973 court-ordered desegregation plan; (2) declared the school system to be unitary; and (3) dismissed the suit against the School Board. Thereafter, the United States filed a motion to amend the judgment, the filing of which suspended the finality of the judgment pending decision on the motion. In 1980, the district court gave notice that unless the plaintiffs’ attorneys objected, the United States, as plaintiff-intervenor, would represent the interests of the private plaintiffs; the district court did not receive any objections. The United States and the School Board then entered into negotiations, which resulted in the district court-ordered 1981 Consent Decree.

b. 1981 Consent Decree

In the 1981 Consent Decree, the district court determined that “the plan for the System embodied in this Decree is reasonable and appropriate for- the additional desegregation of the System, and upon its successful implementation will in fact and in law create a unitary school system for Caddo Parish.”
The decree, among other things, called for the establishment of magnet schools:
“The Board will establish new magnet schools at three elementary schools ... and at one middle school (Eden Gardens Junior High School) in order to enhance the quality of education and bring about a greater degree of desegregation at those schools.... The Board will establish an aggressive magnet recruitment program and will permit and encourage students to attend magnet schools using every reasonable effort to achieve the projected racial enrollment for each school within the time period permitted under this Decree.”
The decree also detailed the projected racial enrollment for each magnet school and how the projection was to be achieved: “It is understood by the parties that magnet programs at particular schools may be revised in order to effectively provide for the recruitment and retention of students in the magnet schools and to achieve and maintain a desegregated enrollment.” The projected racial enrollment for CMMS — formerly Eden Gardens Junior High School, located in a predominantly black neighborhood with a predominantly black student body — was 50% white and 50% black. “[Enrollment at each magnet school” was to “be on a parish wide basis” and students were to be assigned to the magnet schools based on the following pri *252 orities, which were the only priorities stated in the decree: 1) qualified siblings of students who attend the magnet school; 2) qualified black students who would otherwise attend a school with over 90% black student enrollment; and 3) qualified white students who would otherwise attend a school with over 65% white student enrollment. These priorities were to apply, however, only to the extent that they did not impede the School Board’s achievement of the projected racial enrollments at the magnet schools.
The School Board was to implement the magnet school program at Eden Gardens Junior High, which would become CMMS, before or beginning with the 1982-83 school year. The School Board was to “use its best efforts to attain the projected racial enrollments ... by the end of the 1984-85 school year by developing attractive programs at [CMMS] and by encouraging students of both races to attend [CMMS] and benefit from [its] programs.”
The school system was to remain under the jurisdiction of the district court during the period in which the decree was in effect, subject to certain provisions that provided for the termination of the court’s jurisdiction. The decree specifically provided for the termination of the district court’s jurisdiction over the magnet and laboratory[9] schools:
“With respect to the magnet school and laboratory school proposals contained in ... this Decree, the Board shall have three years from the respective implementation dates for each such school within which to meet the projected enrollments at the magnet and laboratory schools. Such projected enrollments for a particular school shall be deemed to have been met if the actual enrollment in the school is within ± 15 percentage points of the projection for such school.... Upon meeting the projected enrollments for all magnet and laboratory schools covered by this Section D of Part V, this Decree shall terminate as to such schools, the Board shall be entitled to an order of the Court so stating, and the United States shall not be entitled to seek any further or additional remedy with respect to such schools.”
Finally, the decree outlined the procedure by which the School Board could seek an order declaring the school system to be unitary and dismissing the case:
“At any time after the 1983-84 school year, the Board may file a Notice of Compliance with the terms and conditions of this Decree. If the United States agrees that the Board is in full compliance with the terms and conditions of this Decree, the United States shall join in the Notice and shall state that it supports an order declaring the System to be unitary and dismissing the case. If no objection to the Notice is made within 30 days of its filing, the Court shall enter an order declaring the entire system unitary, to the extent it has not already been so declared, and terminating this case. Any objections must be specific as to alleged terms of noncompliance with the provisions of this Decree. The objections shall be heard by the Court under reasonable procedures set forth by the Court and in the event any further remedy is ordered, it shall be limited to resolving the objection so filed.”

c. 1990 Order

In 1987, the School Board filed a Notice of Compliance with the 1981 Consent Decree and requested the district court to *253 rule that the school system had achieved unitary status. On April 4, 1990, based on a joint motion filed by United States and the School Board, the district court entered an order affirming the parties’ agreement (the 1990 Order). Jones II, 204 F.R.D. at 98-99. The 1990 Order provided in pertinent part:
“(1) Except as specifically set forth in § 7 of the Joint Motion, there are no issues or disputes regarding successful compliance and full implementation of the 1981 Consent Decree;
(3) The [ ] Board has within the appropriate parameters met the projected enrollments for all magnet and laboratory schools covered by Part V, Sections D[, termination of jurisdiction over magnet and laboratory schools,] ...;
(4) In accordance with Part V, Sections A-E of the Consent Decree:
(i) The Consent Decree is terminated ... as to magnet schools and laboratory schools covered by Sections D and E, Part' V of the Decree, and the United States shall not be entitled to seek any further or additional remedy with respect to any of said magnet schools, laboratory schools, schools north of Cad-do Lake, nor with respect to any Mandatory Assignment District [in the decree].... ”
With the entry of the 1990 Order, none of the remaining “issues or disputes regarding successful compliance and full implementation of the 1981 Consent Decree” involved CMMS, mandatory student assignments, or projected racial enrollments. The portions of the 1981 decree that the United States insisted, in section 7 of the 1990 Joint Motion, had not been fully implemented as required were the following: assignment of principals to schools (under Part I, Section F, entitled “Faculty and Staff’); establishment of enhancement programs at remaining one-race schools (under Part II, Section E, entitled “Remaining One-Race Schools,” relating to programs at such schools); and Majority to Minority Transfers (under Part II, Section F, relating to allowing and encouraging, in reference to one-race schools, transfers of students from a school in which the student is in the racial majority to a school in which the student would be in the minority). See Jones II, 204 F.R.D. at 99 n. 1. .

d. Status of the 1981 Consent Decree

Based on the 1990 Order, the 1981 Consent Decree is no longer applicable to CMMS and cannot form the justification for the use of racial classifications in CMMS’s admission policy. The Consent Decree clearly contemplated that it could be terminated with respect to the magnet schools:
“Upon meeting the projected enrollments for all magnet and laboratory schools ..., this Decree shall terminate as to such schools, the Board shall be entitled to an order of the Court so stating, and the United States shall not be entitled to seek any further or additional remedy with respect to such schools.” (emphasis added).
Under the Consent Decree, the School Board had the obligation to' use “every reasonable effort” and “its best efforts” to “achieve” or “attáin” the projected racial enrollments for CMMS by the end of the 1984-85 school year, and upon meeting the projected enrollments, the Consent Decree was to terminate as to CMMS. The Consent Decree, however, did not give the School Board an indefinite obligation to maintain the projected racial enrollment *254 for CMMS once the decree was terminated as to CMMS.
Consistent with the provisions of the 1981 Consent Decree, the 1990 Order unambiguously released the magnet schools, including CMMS, from any further obligations of or under the Consent Decree: “The [ ] Board has within the appropriate parameters met the projected enrollments for all magnet and laboratory schools”;[10] “The Consent Decree is terminated ... as to the magnet schools ..., and the United States shall not be entitled to seek any further or additional remedy with respect to any of said magnet schools.... ” Therefore, with respect to the 1981 Consent Decree, upon which the School Board justifies its racial classification, there is nothing left regarding CMMS.
Moreover, the law is clear that the School Board’s obligation under the Consent Decree may be reduced or eliminated in some respects even if the entire school system is not totally in compliance with the Consent Decree or has not been declared unitary. In Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court “identified various parts of the school system which, in addition to student attendance patterns, must be free from racial discrimination before the mandate of [Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954),] is met: faculty, staff, transportation, extracurricular activities, and facilities.” Freeman v. Pitts, 503 U.S. 467, 112 S.Ct. 1430, 1443, 118 L.Ed.2d 108 (1992) (citing Green, 88 S.Ct. at 1692). In Freeman, the Supreme Court held that a “district court need not retain active control over every aspect of school administration until a school district has demonstrated unitary status in all facets of its system.” Freeman, 112 S.Ct. at 1436.
“We hold that, in the course of supervising desegregation plans, federal courts have the authority to relinquish supervision and control of school districts in incremental stages, before full compliance has been achieved in every area of school operations. While retaining jurisdiction over the case, the court may determine that it will not order further remedies in areas where the school district is in compliance with the decree. That is to say, upon a finding that a school system subject to a court-supervised desegregation plan is in compliance in some but not all areas, the court in appropriate cases may return control to the school system in those areas where compliance has been achieved, limiting further judicial supervision to operations that are not yet in full compliance with the court decree. In particular, the district court may determine that it will not order further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations.” Id. at 1445-46.
The Supreme Court did recognize that “[t]wo or more Green factors may be intertwined ... in their relation, so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well” and that, “[a]s a consequence, a continuing violation in one area may need to be addressed by remedies in another.” Id. at 1449. Nevertheless, the record must demonstrate why a continuing remedy in one area in which the school system was compliant *255 was needed to remedy the remaining -defects:
“There was no showing that racial balancing was an appropriate mechanism to cure other deficiencies.... It is true that the school district was not in compliance with respect to faculty assignments, but the record does not show that student reassignments would be a feasible or practicable way to remedy this defect.” Id.-.
A case from the First Circuit, Wessmann v. Gittens, 160 F.3d 790 (1st Cir.1998), illustrates the application of Freeman in a situation very similar to the present case. In a background case to Wessmann, a district court in 1974 found “the school system as a whole guilty of de jure segregation” and concluded that three schools operated by the City of Boston, including Boston Latin School (BLS), “were complicit in promoting and maintaining a dual school system.” Id. at 791-92. The district court, among other things, required BLS to ensure that at least 35% of each entering class would be made up of black and Hispanic students. By 1987, the three schools had, “for all practical purposes,” achieved unitary status in the area of student assignments; however, “comparable improvement had not been accomplished in other areas, such as faculty and staff integration and the renovation of facilities.” Id. at 792. Because of the lack of progress in these other areas, in 1987 the First Circuit “instructed that federal court supervision of elements other than student assignment continue.” Id. The district court then relinquished control over student assignments, freeing the schools from the requirement to maintain the 35% set-aside, but retained active supervision over other aspects of the school system. Id.
Similar to the background situation described in Wessmann, in 1990 the district court relinquished judicial supervision over projected racial enrollments at all magnet schools within the Caddo Parish school system by terminating the decree with respect to the magnet schools, as allowed by Freeman and by the terms of the 1981 Consent Decree. While the 1990 Order did not wholly terminate the entire Consent Decree, none of the remaining issues regarding its successful compliance and full implementation involved CMMS. In fact, none of the remaining issues — faculty and staff assignments, enhancing of remaining one-race schools, and majority to minority transfers — related to meeting projected racial enrollments or mandatory student assignments at any school in the system. According to the 1990 Order, the School Board had complied with all student assignment and projected enrollment provisions of the Consent Decree. Furthermore, we see nothing in the School Board’s summary judgment evidence to suggest that continued student racial balancing at CMMS is a “feasible or practicable way” to remedy the remaining deficiencies identified in the 1990 Order. In any event, the Consent Decree stated that the magnet schools were to be established at particular schools “in order to enhance the quality of education and bring about a greater degree of desegregation át those schools,” (emphasis added), not at all schools within the district.[11]
*256 Therefore, based on the 1990 Order, the 1981 Consent Decree is no longer applicable to CMMS and cannot be used in any sense to justify the racial quotas and balancing contained in the CMMS admission policy. As the 1981 Consent Decree has not been applicable to CMMS since 1990, the School Board cannot rely on the Consent Decree to establish a finding of current effects of past discrimination. In order to support its actions, the School Board “must make specific findings, independent of the Decree,” and as there are no such findings before us in the record, “we cannot hold that [the School Board’s actions] were in furtherance of a compelling state purpose.” Police Ass’n of New Orleans Through Cannatella v. City of New Orleans, 100 F.3d 1159, 1169 (5th Cir.1996).
Wessmann also illustrates that the School Board cannot rely on the 1981 Consent Decree to support its contention that it is remedying prior segregation. In Wessmann, after the schools discontinued the use of the 35% racial set-aside, they subsequently adopted a policy that allocated half of the seats of each new class using “flexible racial/ethnic guidelines.” Wessmann, 160 F.3d at 793. Thereafter, a white student who would have been admitted to BLS but for the policy that accounted for race, brought suit against the school committee. The district court upheld the policy in part because it supposedly was aimed at remedying the vestiges of past discrimination. Id. at 793-94. However, on appeal the First Circuit reversed and struck down the policy, rejecting the explanation that the policy redressed the vestiges of past discrimination. The school committee was not able to satisfy its burden of showing a “strong basis in evidence” that the policy remedied past segregation, id. at 800, in spite of the fact that the schools had previously been found guilty of maintaining a dual school system and had been required to specifically reserve at least 35% of BLS seats to certain minorities.
The School Board relies on the unpublished opinion Bryant v. Caddo Parish School Board, CV No. 95-0441 (W.D.La. Jan. 3, 1997). In Bryant, which likewise involved a white student’s challenge to the CMMS admissions criteria, the plaintiffs argued that the 1981 Consent Decree was no longer applicable because of the 1990 Order.[12] The district court rejected the *257 argument, relying on the fact that the plaintiff had not established that the entire Consent Decree had been complied with and on the fact that the entire school system had not been declared unitary:
“Bryant fails to mention, however, that this Court did not hold that Part I, Section F-Faculty and Staff; Part II, Section E — Remaining One-Race Schools; and Part II, Section F — Majority to. Minority Transfers — of the Consent Order had been fully implemented and complied with. Furthermore, Bryant has failed to produce any evidence demonstrating that the Caddo Parish School system has fully implemented and complied with the remaining sections of the Consent Decree. Thus, the Caddo Parish public school system has not been declared unitary and the Consent Decree still applies to the Cad-do Parish Schools which, of course, includes [CMMS].” Id.
On appeal, this court summarily affirmed the district court, stating only:
“We have carefully reviewed the briefs, the records excerpts and relevant portions of the record itself. For the reasons stated by the district court in its memorandum ruling and Order filed under date of January 3, 1997, we are satisfied that the Summary Judgment granted by the district court in favor of Caddo Parish School Board should be and is now AFFIRMED.” Bryant v. Caddo Parish School, No. 97-80135, 129 F.3d 608 (5th Cir. September 26, 1997) (per curiam; unpublished).
We are not bound by our affirmance of the district court in Bryant. The opinion is not precedential, as it is an unpublished opinion issued pursuant to Fifth Circuit Rule 47.5 after January 1, 1996. Under Rule 47.5.4, the opinion is binding only under the doctrines of res judicata, collateral estoppel, or law of the case, none of which apply here.
While an unpublished opinion may be persuasive under Rule 47.5.4, we are not persuaded by the Bryant affirmance or by the underlying district court opinion. We based our affirmance on the “reasons stated by the district court in its memorandum ruling,” without providing any independent analysis. The district court’s one-paragraph discussion of the 1981 Consent Decree in light of the 1990 Order did not address several key points of the analysis: 1) the Supreme Court’s decision in Freeman that allows a school district to be declared unitary in an incremental fashion; 2) the Consent Decree itself contemplated that the magnet schools would be released from the decree when their related obligations were implemented; 3) the purpose *258 of the magnet schools was to “enhance the quality of education and bring about a greater degree of desegregation at [the schools that were to become the magnet] schools,” (emphasis added); and 4) there is no clear relationship between the remaining deficiencies outlined in the 1990 Order, none of which dealt with racial enrollment projections, and racial balancing at CMMS. Therefore, the Bryant case does not influence our reasoning with respect to the 1990 Order and its effect on the 1981 Consent Decree.[13]
The School Board also points to, and the magistrate judge relied on, Davis v. East Baton Rouge Parish School Board, 721 F.2d 1425 (5th Cir.1983), in which this court upheld an admission policy similar to that used by the School Board here. In Davis, the school board operated under a court-approved admission policy according to which the board selected applicants to its magnet schools using two lists, one for white students and one for black students. The board was to fill seats from the separate lists to achieve a racial balance at each magnet school of 60% white students and 40% black students. If by April 1 of each year the seats at a magnet school reserved for a particular race had not been filled, those seats could be opened to students of any other race. The district court, however, later modified the admission policy directing that white students could not be admitted in any proportion greater than 60% of the total enrollment. The school board appealed the modification and we affirmed. Id. at 1440. Davis is wholly distinguishable from the present case. In Davis, the school board was still under the court’s supervision with respect to the admission policy. Further, almost no time had passed since the creation of the court’s plan — the plan was designed to begin in the 1981-1982 school year and was modified in 1982, and our ruling was issued in 1983. Id. at 1433-34, 1440. The situation in the present case is significantly different — the Consent Decree was issued in 1981, judicial supervision over CMMS was withdrawn in 1990, and there have been no subsequent findings of segregation or vestiges of past segregation or orders requiring the continued use of remedial racial classifications. In addition, in Davis the use of separate lists was explicitly part of the court-approved plan. In contrast, here the Consent Decree did not mandate, or even suggest, that the School Board use separate test-score ranking lists for blacks and whites; the use of separate lists is directed by the School Board’s own admission policy. Davis, therefore, is simply not applicable here.

e. No Other Vestiges of Past Segregation

There is no evidence in the record of current segregation within the school system or at CMMS or vestiges of past discrimination.[14] The School Board thus fails *259 to show that it has a “‘strong basis in evidence’ showing that a current social ill in fact has been caused by such conduct.” Wessmann, 160 F.3d at 800 (quoting City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 725, 102 L.Ed.2d 854 (1989)).

2. No Other Compelling Interests

Besides relying on the 1981 Consent Decree, the School Board has not attempted to argue, or make any showing, that the racial classifications in its admission policy can be justified by some other compelling governmental interest. The magistrate judge also relied exclusively on the decree to uphold CMMS’s admission policy, explicitly stating that it was not deciding, or being asked to decide, whether it could constitutionally order the implementation of the admission policy or whether the policy- could withstand ■ a constitutional challenge if the purpose was to achieve diversity[15] or some similar social goal.
*260 The School Board’s current policy is essentially a racial balancing quota. The 1981 Consent Decree no longer applies to CMMS, and racial balancing by itself is not a constitutionally proper reason for employing racial classifications: “[T]he Court has consistently held that the Constitution is not violated by racial imbalance in the schools, without more.” Milliken, 97 S.Ct. at 2757 n. 14. See also Freeman, 112 S.Ct. at 1447 (“Racial balance is not to be achieved for its own sake.... Once the racial imbalance due to the de jure violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors.”).
The School Board has failed to show any compelling governmental interest that it furthers by its racial classification. The policy is therefore unconstitutional.

C. Narrowly Tailored

Moreover, the School Board’s policy is not narrowly tailored to remedy the present effects of past segregation, the compelling interest allegedly supported by the Consent Decree. In the context of remedying past discrimination, a narrowly tailored measure requires that the state actor consider the use of other race-neutral means. Croson, 109 S.Ct. at 729. Further, a quota system “cannot be said to be narrowly tailored to any goal, except perhaps outright racial balancing,” id., and “[r]acial balance is not to be achieved for rts own sake.” Freeman, 112 S.Ct. at 1447.
The School Board’s policy is not narrowly tailored. “To be narrowly tailored, a race-conscious admissions program cannot use a quota system — it cannot ‘insulat[e] each category of applicants with certain desired qualifications from competition with all other applications.’ ” Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 2342, 156 L.Ed.2d 304 (2003) (quoting Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 2761, 57 L.Ed.2d 750 (1978) (Powell, J.)). Further, there is no evidence that the School Board has considered any race-neutral means which might arguably result in an increase in the percentage of black students at CMMS.[16] Moreover, as the School Board cannot justify its outright racial balancing absent a showing of current effects of pri- or segregation, which it has not done, its use of a racial quota is improper. While “the use made of mathematical ratios” as “no more than a starting point in the process of shaping a remedy, rather than an inflexible requirement,” might be appropriate in certain contexts, Swann, 91 S.Ct. at 1267 (emphasis added), the School Board’s use of a racial quota supposedly pursuant to the 1981 Consent Decree but more than twenty years after the signing of the decree — and more than a decade after the 1990 Order — -is hardly a “starting point” and appears rather to be an improper “inflexible requirement.”[17]
*261 With respect to narrow tailoring, we also observe that the policy does not even follow the dictates of the 1981 Consent Decree itself. The Consent Decree did not expressly mandate the use of a race-conscious admission policy.[18] Although the Consent Decree did give a projected racial enrollment goal, all the measures that it specifically mentioned were race-neutral ones. The Consent Decree provided that the School Board would “establish an aggressive magnet recruitment program and [would] permit and encourage students to attend magnet schools using every reasonable effort to achieve the projected racial enrollment for each school.” (emphasis added). The School Board was to use its “best efforts to attain the projected racial enrollments [for the magnet schools] ... by developing attractive programs at [the magnet schools] and by encouraging students of both races to attend such schools and benefit from their programs.” (emphasis added). The Consent Decree further explained that “magnet programs at particular schools may be revised in order to effectively provide for the recruitment and retention of students in the magnet schools and to achieve and maintain a desegregated enrollment.” (emphasis added).
The Consent Decree did not mandate that the School Board employ a separate list/quota system or any other such race-conscious policy to arrive at the projected racial enrollment goal. Rather, the School Board was to use every reasonable effort and its best efforts to recruit and encourage students and to develop attractive programs and to revise the programs in order to achieve and maintain the desired level of desegregation. The School Board’s use of a racial quota does not constitute any one (or a combination) of the actions expressly mandated by the Consent Decree. Moreover, the Consent Decree itself wholly terminated more than a decade ago as to the magnet schools.[19]
*262 Conclusion
Based on the foregoing, we REVERSE and REMAND for further proceedings not inconsistent with this opinion.
REVERSED and REMANDED.

. On this appeal, as throughout the proceedings in the district court, the Cavaliers proceed pro se.

. The policy also has two nonacademic requirements: the students must have parental permission and support and be in good health or under a doctor's care.

. In 2001, the Board approved Item No. 37, which required CMMS enrollment to be within the parameters of a consent decree entered in 1981, discussed infra. The consent decree gave a projected racial enrollment for CMMS of 50% black/white, plus or minus 15 percentage points.

.Based on our review of data obtained by the Cavaliers from the School Board and submitted in conjunction with a motion for preliminary injunction, it appears that if the School Board did not use separate test-ranking lists for white and black applicants, the score that would have resulted in a sixth grade class at *249 CMMS for the 2002-2003 school year of roughly the same size as the actual class would have been 130. Using a score of 130, the sixth grade class apparently would have been approximately 25% black and 75% white.

. The magistrate judge previously had dismissed the Cavaliers’ claim for compensatory damages against the individual members of the School Board based on qualified immunity. The Cavaliers have not appealed that ruling.

. On July 29, 2004, some two months subsequent to oral argument herein, the School Board filed with this court a motion to dismiss the appeal as moot. The School Board attached to its motion an affidavit from its counsel in which she stated that: on May 19, 2004, she mailed a letter to the Cavaliers advising them that there were openings for the eighth grade at CMMS for the 2004-2005 school year; if Hunter met the general requirements for admission, he would be admitted to the eighth grade at CMMS upon the submission of an application, included with the letter to the Cavaliers; and no further testing would be needed for admission. The School Board claims that this offer of admission to Hunter renders the appeal moot.
We disagree. In their complaint, the Cavaliers sought, among other things, compensatory damages. In their opposition to the School Board’s motion to dismiss the appeal, the Cavaliers have alleged damages due to the School Board’s policy. The Cavaliers brought their suit in 2002 after Hunter was denied admission to CMMS for the 2002-2003 school year, his sixth grade year. The Cavaliers allege that because of the denial of Hunter’s admission to CMMS, in order to provide the best alternative to CMMS, they enrolled him in a private school for two years, his sixth and seventh grade years, at a cost that was presumably higher than what they would have had to pay if Hunter had attended CMMS. The private school was also allegedly further from their residence than CMMS, resulting in additional transportation costs. The Cavaliers have sought, among other things, compensatory damages and have alleged damages due to the School Board’s policy. Past damages that are in no way addressed by the offer of admission to Hunter for his eighth grade year. We accordingly deny the motion to dismiss the appeal, as moot.

. Although the Board filed a motion to dismiss or for summary judgment, because the magistrate judge considered materials outside of the pleadings, we treat the motion as a motion for summary judgment. See Meister v. Tex. Adjutant General's Dept., 233 F.3d 332, 335 (5th Cir.2000).

. In their interrogatories, the Cavaliers asked that the School Board describe all evidence of present effects of past racial discrimination that could justify the use of racial classifications in its admission process. The School Board responded that the reason for the use of the racial classifications was “to comply with the [1981] Consent Decree.” The School Board then stated that "[t]here has not been any attempt to determine if other reasons exist which could justify the use of racial classifications.”

. The decree directed the School Board to establish a laboratory school program that would be operated in conjunction with area universities and colleges.

. CMMS opened for the 1982-1983 school year and met its projected racial enrollment level of at least 35% black students during its first year and three out of the first four years. The black student enrollment for the first four years was: 37.3% (1982-1983), 36.1% (1983-1984), 34.4% (1984-1985), 38.8% (1985-1986).

. The School Board argues that until the school system is declared unitary in whole or in part, the School Board is obligated by law to comply with the provisions of the Consent Decree. This is, in essence, a collateral attack on the 1990 Order. Moreover, the Board’s argument fails to recognize the holding in Freeman:
"To say ... that a school district must meet all six Green factors before the trial court can declare the system unitary and relinquish its control over school attendance *256 zones, and to hold further that racial balancing by all necessary means is required in the interim, is simply to vindicate a legal phrase. The law is not so formalistic.” Freeman, 112 S.Ct. at 1448-49.
Similarly, in finding that the admission policy was justified because of the 1981 Consent Decree, the magistrate judge stated that the 1990 Order "did not declare expressly that the district was unitary in student attendance patterns.” Nevertheless, even though the 1990 Order did not use the magic word “unitary” with respect to the magnet schools, that was its effect. The 1990 Order expressly "terminated” the 1981 consent decree "as to” the "magnet schools” and declared that all provisions concerning the magnet schools, and concerning all student assignments and projected racial enrollments, had been fulfilled and that the United States was not entitled to seek further remedies with respect to the magnet schools or any mandatory student assignment provision in the decree. The 1990 Order did not need to specifically say "unitary” to effectively declare that the magnet schools were outside of the 1981 Consent Decree.

. Both the policy in Bryant and in the present case have the same criteria to determine qualified applicants and to rank those qualified applicants. The policy in the present case mandates the use of two ranking lists-one for white students and one for black students, and while there is no indication in Bryant that the policy involved there mandated two separate ranking lists, we nevertheless assume that it most likely did: Policy JECC indicates that it was adopted February 2, 1983, and amended January 16, 1985, with *257 out any indication that its content was any different when Biyant applied to CMMS in 1994 than it was when Hunter applied in 2002. Also, at oral argument, the School Board claimed that policy in Bryant is the same policy before us now. If there is any difference between the two cases, it may be with respect to the projected racial enrollment requirement — here the racial mix is a requirement, whereas in Bryant it was merely a goal. In the present case, the Board is governed by Item No. 37 — adopted after Bryant — requiring CMMS to be within the racial parameters of the 1981 Consent Decree (50/50, ± 15 percentage points). In Bryant, however, the racial enrollment goal of 50/50, ±15 percentage points appears to be only a goal., Nevertheless, regardless of Item No. 37, Policy JECC, the policy presumably in effect at the time of Bryant, provides that "vacancies will be filled from the rankings in accord with the projected racial enrollments called for in the Consent Decree.” While Item No. 37 appears to make the 1981 Consent Decree racial enrollment projections a firm requirement for the School' Board, it appears that even at the time of Bryant, the admission policy sought to fill vacancies according to the same projections. Therefore, the policy in Bryant appears to be substantially the same as the policy in the present case.

. Concerning the 1990 Order and its effect on the 1981 Consent Decree, in 2001 the district court in Jones II commented that the parties seeking to intervene at that time were seeking to do so "twenty years after the district court entered the 1981 Consent Decree, and 11 years after the court granted unitary status to the school district." Jones II, 204 F.R.D. at 100 (emphasis added). The district court then stated that the "only issue remaining before this court is continued compliance with the parameters of the 1990 order." Id. While this is not determinative, it does indicate that one previous district judge thought, as we hold now, that the 1990 Order did reduce the scope of the 1981 Consent Decree.

. At oral argument, counsel for the School Board suggested two vestiges of past segregation: the fact that the school system still has several one-race schools and the test-score disparity between white and black students. As this "evidence” is not in the record and was suggested for the first time at oral argument, it is not properly before us. United *259 States v. Simpson, 334 F.3d 453, 454 n, 1 (5th Cir.2003).
Nevertheless, even if we were to consider the School Board’s suggested vestiges, the School Board has not shown that the existence of the one-race schools and the test-score gap is traceable to past segregation. Regarding one-race schools, the Supreme Court has declared that "the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law.” Swann v. Charlotte-Mecklenburg Bd. of Ed., 402 U.S. 1, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). For instance, in Davis we upheld a district court-created plan that left 11 one-race elementary schools. Davis, 721 F.2d at 1433. Furthermore, the 1981 Consent Decree itself explicitly recognized that the elimination of all one-race schools within the school system was not practicable: "The parties and the Court recognize that the elimination of all racially identifiable schools in the System is impracticable.” "[T]he parties, after exploring all avenues to attempt to achieve desegregation in [certain] schools, have determined ... that there is no feasible and practical means of accomplishing desegregation at those schools other than the actions [described concerning one-race schools].” "[T]here will remain'under the provisions of this Decree a number of one-race or predominantly one-race schools which, for various reasons ..., it is not practically possible to effectively desegregate given the current circumstances existing in Cad-do Parish.” The School Board has not shown in any way, particularly in light of the Consent Decree’s language, how the continued existence of one-race schools is traceable to past segregation within the school system.
Concerning the test-score gap, the Board has produced no evidence and provided no analysis whatsoever regarding a causal connection between the gap and past de jure segregation. As "achievement gap statistics, by themselves, do not even eliminate the possibility that they are caused by what the Court terms ‘societal discrimination,’ " Wessmann, 160 F.3d at 803, the mere suggestion that the gap is a vestige of past discrimination is not sufficient. Moreover, it is obvious that virtually none of the students entering the eighth (or lower) grade for the 2002-03 school year was or had ever been a student at any school governed by the School Board when the 1990 Order was entered.

. The School Board has not claimed that its policy seeks to achieve diversity among the students at CMMS. The School Board has specifically limited its justification for the policy to the 1981 Consent Decree and expressly argued, in its briefs and at oral argument, that Grutter and Gratz are distinguishable and "veiy different” cases because they dealt with efforts to achieve diversity in the student body and not with a desegregation order to remedy past discrimination. Moreover, while student body diversity has been held a compelling state interest in the context of a law school, Grutter v. Bollinger, 539 U.S. 306, 123 S.Ct. 2325, 2339, 156 L.Ed.2d 304 (2003), it is by no means clear that it could be such at or below the high school level. But see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 377 F.3d 949, 964 (9th Cir.2004) (applying Grutter to hold that diversity in the public high school context can be a compelling governmental interest). In any event, the quota system applied here would seem to clearly fail to pass muster under Gratz v. Bollinger, 539 *260 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003).

. Some examples of race-neutral means that the Board might have considered include: recruiting highly qualified black students who might not otherwise apply to CMMS, employing programs in elementary schools to improve standardized test scores for potential but underachieving student applicants, or considering certain characteristics of the applicants’ parents (such as socio-economic status, educational level, or number of parents in a student's home).

. The School Board does not see its use of racial quotas as a starting point and does not appear to have an end in mind. In an interrogatory, the Cavaliers asked the School Board to describe "any time limitation after which all consideration of race in the admissions policy at [CMMS] ... will be discontinued, or any objective, which if attained, would cause all consideration of race in the admis *261 sions policy at [CMMS] to be discontinued.” In response, the School Board simply stated that the "current policy will be followed as long as the policy is in effect. Whether the Board in the future may revise the policy calls for speculation.” The School Board's policy clearly is not a starting point, and the consideration of race is not specifically and carefully limited, at least in the temporal respect, to some compelling interest.

. The School Board has admitted that the Consent Decree only implicitly mandates the use of a race-conscious admission policy. In response to the Cavaliers’ request for any evidence that the School Board had received approval from the district court to use racial classifications, the School Board pointed to the 1981 Consent Decree and stated that it ”consider[ed] it implicit in this Decree that magnet schools, because they do not enroll children on the basis of attendance zones, must use race conscious admissions policies in order to meet the required projected racial enrollments, and that race conscious admissions policies are permitted.” (emphasis added).

. A brief response to the dissent.
The dissent relies on the language in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), and the similar language in the companion case of North Carolina State Board of Education v. Swann, 402 U.S. 43, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971), to the effect that "[sjchool authorities ... might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole .... to do this is within the broad discretionary powers of school authorities ...”. This language is the purest passing dicta. No such issue was even arguably before the Court or presented by the facts of either case; no authority whatever, legal or otherwise, is cited in support; and the statements made do not form any link in the chain of reasoning by which the Court arrived at the holdings it made in those cases. Moreover, the cited language in Swann — -particularly as applied to race based magnet school admissions — has clearly been super-ceded by that of Adarand Constructors, Inc. v. *262 Pena, 515 U.S. 200, 115 S.Ct. 2097, 2111, 132 L.Ed.2d 158 (1995), and Gratz v. Bollinger, 539 U.S. 244, 123 S.Ct. 2411, 156 L.Ed.2d 257 (2003), the court stating in Gratz: "It is by now well established that ‘all racial classifications reviewable under the Equal Protection Clause must be strictly scrutinized.' ” Id. at 2427 (emphasis added; quoting Adarand, 115 S.Ct. at 2097). The dissent’s citation in this connection of Washington v. Seattle School District No. 1, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982), is similarly unpersuasive; indeed there the Court noted that "Appellants and the United States do not challenge the propriety of race-conscious student assignments for the purpose of achieving integration, even absent a finding of prior de jure segregation. We therefore do not specifically pass on that issue.” Id. at 3196 n. 15.
Gratz applied strict scrutiny notwithstanding the presence of a compelling state interest. Even prior to Gratz, lower courts had applied strict scrutiny to use by educational authorities of race based preferences as remedial measures for past discrimination. See, e.g., Podberesky v. Kirwan, 38 F.3d 147, 152-53 (4th Cir.1994), cert. denied, 514 U.S. 1128, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995). See also Johnson v. Board of Regents, 263 F.3d 1234, 1265 (11th Cir.2001); Eisenberg v. Montgomery County Public Schools, 197 F.3d 123, 128-29 (4th Cir.1999); cf. Police Ass’n of New Orleans v. City of New Orleans, 100 F.3d 1159, 1169 (5th Cir.1996) ("Even assuming that the promotions were made to remedy specific past discrimination, the actions before us were not narrowly tailored, as required” by strict scrutiny). Indeed, the dissent seems to ultimately recognize all this (as well as the wholly unpersuasive nature in this context of the Swann passing dicta it quotes).
The dissent errs in reliance on the holding in Belk v. Charlotte Mecklenburg Board of Education, 269 F.3d 305 (4th Cir.2001), exonerating the school board from damages for race-based admissions to a magnet school pri- or to the district court's dismissal of the underlying decree on the basis that the district was unitary. In Belk, unlike the situation here, there had been no prior order specifically removing the magnet schools from the extant desegregation orders. Of the six judges in Belk who voted for this holding (five judges would have held the board liable), four were of the view that the prior orders, extant at the time for which damages were sought, "specifically authorized the use of fixed ratios based on race in assigning students to magnet schools.” Id. at 408 (opinion of Judge Motz) (and it is not clear that the other two judges in the six judge majority were not of the same view; see id. at 353-56, opinion of Chief Judge Wilkinson). Belk might be analogous to this case if this case involved a claim for denial of access to CMMS in, say, 1986. Rather, this case involves denial of access to CMMS more than a decade after the 1990 order entirely removing it from the only extant court order, and is hence analogous to Wessmann v. Gittens, 160 F.3d 790 (1st Cir.1998), cited with apparent approval in Judge Motz's Belle opinion (269 F.3d at 410).
Moreover, in view of the wording of the 1990 order — which expressly “terminated” the 1981 order (the only extant desegregation related order) "as to [the] magnet schools” and provided "the United States shall not be entitled to seek any further or additional remedy with respect to any of said magnet schools,” it is wholly clear that there was no reasonable possibility whatever that the school board could be exposed to sanctions for post-1990 abandonment of its rigid racial quota magnet school admissions policy (which itself was never mandated by the 1981 decree). Finally, it is manifestly unfair and illogical to place on the plaintiffs the burden to prove that there was no conceivable justification for the board's use, over a decade after the 1990 order, of a rigid racial quota admissions system at CMMS, when the board had all the relevant data and resources but defended its action below only on the manifestly erroneous ground of compliance with the 1981 decree (see note 8 and accompanying test supra).